# National Journal Cover Stories

Feb. 10, 2006

**COVER STORY**

## Guantanamo's Grip

Click here for a print friendly version

**National Journal Group**
Learn more about our publications and sign up for a free trial.

— ADVERTISEMENT —
— ADVERTISEMENT —

**E-Mail Alerts**
Get notified the moment your favorite features are updated.

**Need A Reprint?**
Click here for details on reprints, permissions and back issues.

**Advertise With Us**
Details on advertising with National Journal Group -- both online and in print -- can be found in our online media kit.

**Go Wireless**
Get daily political updates on your handheld computer.

GOVEXEC.COM

By Corine Hegland, *National Journal*
© National Journal Group Inc.
Friday, Feb. 3, 2006

You may have seen an image of Detainee 032. He came to Guantanamo Bay early on, a slender 18-year-old Yemeni among the anonymous men who knelt, dressed in orange, for the photographs viewed around the world. He was there on January 27, 2002, when Defense Secretary **Donald Rumsfeld** took four senators to see the "most dangerous, best-trained, vicious killers on the face of the earth." He was there two days later, when **President Bush** proudly declared in his State of the Union address that the "terrorists who once occupied Afghanistan now occupy cells at Guantanamo Bay," and he was there one week later when Bush firmly and finally ruled out prisoner-of-war status for any of the men held at Guantanamo.

Like many of the men who came handcuffed to Cuba, Detainee 032 has never been accused of fighting against America. He fell into U.S custody far away from any battlefield. But today, after four years of interrogations and investigations, he is still an "enemy combatant," even though he was never an enemy or a combatant. He is something else: something that might be dangerous or might not. But he's securely in our custody, and raise your hand if you want to be responsible for releasing the man who next flies an airplane into a skyscraper.

In some other world, one where the earth still turned west to east instead of inside out as it did on September 11, 2001, Detainee 032 would be finishing college this year, like his brother, father, and uncle before him. In this world, he's beginning his fifth year in prison, with neither charges nor freedom in sight.

### "No Court, Justice, Or Judge ... "

**David Remes**, a veteran litigator at the Washington law firm Covington and Burling, spotted the first sign of trouble over his morning coffee on November 8 last year. He was reading a *Washington Post* story about the Supreme Court's decision to accept a challenge to the military



**Also In This Issue**
Related stories are available to subscribers only:

Who Is at Guantanamo Bay
·
Empty Evidence

**Related Resources On NationalJournal.com**
Poll Track: 2006 Polling On Terrorism
·
*National Journal* Cover Story: "Crescent Conflict" (11/18/05)
·
Social Studies: "Guantanamo's Problem Isn't In Cuba. It's In Washington." (7/08/05)
·
Opening Argument: "Congress Must Stop Ignoring 'Enemy Combatants'" (1/10/05)
·
Well-Read Wonk: "When A Picture Is Worth Just A Few Words " (3/11/04)



Search
advanced search

**Policy Council: Sponsored Links**

———

Position papers, expert

commissions that had been set up to decide the fate of a handful of Guantanamo detainees. The military lawyers defending the men had sued the government, arguing that the proposed proceedings fell outside any military, criminal, civil, constitutional, or international law that they had ever heard of. Turning to the jump page of the *Post* story, Remes saw an unexpected item in the penultimate paragraph, a report that Sen. **Lindsey Graham**, R-S.C., hoped to "add language to the Defense authorization bill that would eliminate habeas rights for detainees captured during the terrorism fight, to halt 'the never-ending litigation that is coming from Guantanamo.'"

Outside of the Ten Commandments, laws don't come much more primal than habeas corpus. It's an ancient bulwark against imprisonment without charge; the medieval Latin phrase, roughly translated, means "You have the body." Bringing a habeas petition forces the jailer to explain why he's holding the petitioner. Habeas corpus predates even the Magna Carta of 1215. The right is enshrined in the U.S. Constitution, and on June 28, 2004, the Supreme Court said it extended to the detainees at Guantanamo Bay.

contacts and other resources from Policy Council members are available below.

Additional Resources On The Web
Amnesty International: Guantanamo Bay
.
Department Of Defense: 'Gitmo' Proceedings
.
FindLaw: Federal Habeas Corpus Review
.
*National Public Radio*: Detainees at Guantanamo Bay
.
Physicians For Human Rights: Torture at Abu Ghraib & Guantánamo

Upon reading of Graham's intention, Remes, who has 17 habeas petitions in court on behalf of Guantanamo prisoners -- including one for Detainee 032 -- fired off an e-mail to the 500-plus lawyers volunteering their services for the detainees. The lawyers started asking around: "Does anybody know anything about this?"

It was the first any of them had heard of Graham's proposal. "We're not lobbyists, we're litigators," one lawyer later moaned, recounting the ensuing panic. They had spent a year and a half duking it out in court with the Bush administration's attorneys, slowly forcing the executive branch to explain why it was holding individual men -- 132 such explanations so far. Two federal judges had split over the habeas petitions. One declared that the men had a right to court; a second said they did not and granted the government's motion to dismiss the cases. Everybody was waiting for the U.S. Court of Appeals for the D.C. Circuit to speak about the conflicting decisions, and whatever the appeals court ruled would likely head to the Supreme Court. The lawyers had simply never considered any role in this dispute for the third branch of government, Congress. It was as though they were playing checkers and winning -- only to discover that the game was chess.

The attorneys scrambled into a full-court press, calling their senators, writing editorials for local and national papers, walking the halls of Congress. But it was already too late. A week later, Congress passed the Defense authorization bill, including the amendment, which had been somewhat modified by Sen. **Carl Levin**, D-Mich. President Bush signed the bill into law on December 30, and on January 6 the Justice Department began asking judges to dismiss the cases.

But the game is not over yet. The Graham amendment leaves detainees one avenue of judicial appeal. They can challenge the process by which they were designated "enemy combatants" before the U.S. Court of Appeals for D.C., although the court's jurisdiction stops when the men are removed from Guantanamo Bay. The appeals court typically takes months, if not years, to work through a case. Furthermore, a narrow interpretation of the amendment means that the men might be able to challenge only the process -- the

dotting of i's and the crossing of t's -- not the underlying facts.

More promising for the advocates, the Center for Constitutional Rights, which has coordinated the pro bono detainee effort since 2002, filed habeas petitions on behalf of every remaining man at Guantanamo before Bush signed the bill. The lawyers intend to argue that the legislation can't strip courts of their ability to hear pending cases, a position bolstered somewhat by Levin's contention that the bill was never intended to affect those pending petitions.

The amendment's language, though, is stark: "No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba."

Law Of War

Most of the lawyers who represent the detainees say they volunteered their services because of a gut impulse about the importance of due process; they didn't spend a lot of time musing about why due process exists. Their prospective clients, they thought, were probably terrorists, the infamous "worst of the worst." They may have killed Americans in Afghanistan; they may have helped to kill Americans in America. Still, even terrorists are entitled to their day in court. Lawyers don't take kindly to being told that their skills aren't needed.

"These are people picked up off the battlefield in Afghanistan. They weren't wearing uniforms, they weren't state-sponsored, but they were there to kill," President Bush said last June, after Amnesty International criticized Guantanamo as the "gulag of our times."

But a battlefield implies stark lines of separation: Here, I'm trying to kill you. There, you're trying to kill me. Battlefield justice is swift, proximity implies culpability, and buzzing bullets brush aside legal niceties. The farther you move from the bullets, however, the grayer and messier the lines become. If the law of war surrounds the battlefield, and you know what to do with men who are captured with guns in hand, then consider this: More than 3,000 Taliban fighters surrendered to Gen. **Rashid Dostum**, a U.S. ally in the anti-Taliban coalition, at Konduz, Afghanistan, in November 2001. The agreed-upon surrender terms were that Afghan nationals would be allowed to put down their weapons and go home but that any foreign fighters would be placed in U.N. custody. Instead, Dostum, acting in accordance with his historical disregard for human life, locked them all into airtight container trucks. Some sympathetic Afghan drivers punched holes in the trucks and passed water to the prisoners when the general's men weren't looking, a crime for which one driver was brutally beaten, they later told *Newsweek*. When the trucks finally arrived at the Sheberghan prison in northwest Afghanistan, dead bodies spilled out. How many of the men died isn't clear: Nobody has exhumed their mass grave, although both the United Nations and the Physicians for Human Rights have identified its location as only a few minutes from the prison.

Some of the men who survived that convoy are at Guantanamo, and clearly, they were captured on a battlefield. But if proximity implies culpability, how do you justify the detention of so many others in Cuba who were arrested far from any Afghanistan front? How about the aid worker sleeping at home in Karachi, Pakistan? How about the men arrested in Sarajevo and sent by the Americans to Guantanamo even though they were clutching their exoneration-from-terrorism papers issued by the judge who had reviewed their cases? How about miscellaneous Arabs -- some fighters, some not -- who together with other refugees passed through Afghanistan's borders as war arrived? How about two British Muslims arrested as they stepped off a plane in Gambia? How about a hypothetical little old lady in Switzerland who writes checks to a charity, not knowing it's a terrorist front, but who a government lawyer nevertheless conceded in court could be properly termed an enemy combatant? The law of war has come far in a

century of genocides and massacres and nuclear bombs. But has it come so far that when Al Qaeda made the entire world a battlefield, all of the world's population fell under the law of war?

As the U.S. government started putting its cards on the table, explaining why the men described above, and others like them, were still behind bars, the habeas lawyers started to ponder more deeply what happens to justice -- even in a wartime setting -- when you strip away due process and the presumption of innocence.

The government told the lawyers that their clients were all well-trained liars. But as the lawyers read the files, they started to wonder whether they were facing an impossible paradox: After all, if a well-trained liar looks like an innocent man, what does an innocent man look like, if not a well-trained liar?

### Detainee 032

Back before everything happened, before the world came unhinged, Detainee 032 was a boy of 16 living in Yemen with his mother, his father, his four sisters, and his five brothers. His name was **Farouq Ali Ahmed**, and he studied Islamic law in high school.

One day, the boy made a solemn vow before God: If it was God's will that Farouq commit the Koran to memory, more than 6,000 verses in all, he would spend a year, before he went off to college, teaching the holy texts, in Afghanistan. A man who did this thing, he'd been told, would be rewarded by God.

Any number of young men in those years set off for Afghanistan with their heads full of God. The land of the Hindu Kush mountains was a broken Islamic nation, in desperate need of succor. Some tales say that the Taliban rose to power after young ethnic Pashtuns executed an Afghan warlord for raping two young girls; others say a single young boy was the victim. Regardless, the men from the eastern mountains had rallied under the name of the Taliban, "the students of the book," and they promised stability and a return of piety in a country sick to death of two decades of war. Fighting continued in the north, with the Northern Alliance and the Taliban trading atrocities as they traded ground, but the land under the Taliban's control remained stable, if barbaric.

World governments shunned the Taliban, which gained diplomatic recognition from only three countries -- Pakistan, Saudi Arabia, and the United Arab Emirates -- but conservative and radical imams throughout the Islamic world exhorted followers to help their Afghan brothers defend Islam against those who would destroy it: the Tajiks, Uzbeks, and apostate Shiite Hazara of the Northern Alliance. **Osama bin Laden** came early on; his Arab fighters helped the Taliban soldiers and trained new arrivals.

Nearly all of the foreigners who came to Afghanistan for jihad came to fight not the United States but the Northern Alliance. Some put in a few months of fighting in the north before returning home, their Islamic duty done; some stayed longer. One man in Guantanamo, asked whether he was a member of Al Qaeda, replied simply, "I do not know. I am an Arab fighter."

Others didn't go to Afghanistan to fight but to help in other ways, or just to work and live. The Arabs in Afghanistan, according to **Barnett Rubin** of New York University, who has studied the country since the 1980s when the United States funded the mujahedeen fighting the Soviets, weren't all jihadist fighters, any more than all Westerners in Afghanistan at the time were CIA operatives -- although many in both groups properly fell under those assumptions. "Arabs went there for a lot of reasons," Rubin said. "There were humanitarian organizations, religious missions, and adventure-seekers." A Christian nonprofit group, Save the Children, had workers providing schooling and medical care. Muslim organizations ran clinics and schools and dispensed what aid they could; U.N. workers provided daily bread for more than 3

million people.

And some Arab men went to Afghanistan to teach the Koran in an Islamic land where few could read the word of God.

Such was Allah's will that in the spring of 2001, Farouq, then 17, set off for Afghanistan. He took a little room in a big house in Kabul and began teaching 7- and 8-year-olds, gathering four or five of them together and reciting Allah's words until the children had them memorized. It wasn't easy work. The Koran is always taught in Farouq's native language, Arabic, which the Afghan children didn't understand, and Farouq didn't speak their language. But he had made an oath to Allah. After a few months, he moved to the city of Khost, where he continued to teach out of a mosque until the Taliban fell and the cities were no longer safe for Arabs. One day, his host told him that if he stayed any longer, his life would be in danger. He had left his passport in Kabul for safekeeping, but he was told there was no time to get it back. He was taken to Pakistan, where Afghans have long sought haven from their never-ending wars.

Once across the border, Farouq encountered the Pakistani military. "One of the soldiers pointed a weapon toward me," Farouq told his Combatant Status Review Tribunal. The Defense Department established the tribunals after the Supreme Court ruled that the detainees could challenge their imprisonment. "The Pakistani officer took me and said, don't be mad at him, we are Muslim, we will take care of you. He asked me about my parents. He said, you are a kid, you are going to the Yemen Embassy, and you shouldn't have any problems getting back to Yemen. After that, they took me to a jail, and there were lots of people. They put handcuffs on our hands."

Farouq spent time in two Pakistani prisons before the government handed him over to American forces in Afghanistan. As a foreigner without a passport, he met the U.S. criteria for Guatanamo, and he was quickly whisked onto a plane headed for the sunny Caribbean jail that most military people refer to simply as "The Bay." In the chaos of post-9/11 Afghanistan, military leaders say, there wasn't time for much consideration of anomalies like Farouq. The United States was pulling Arabs, Afghans, Pakistanis, Chinese into detention centers, some tens of thousands in all. U.S. intelligence agents weren't able to debrief every prisoner; just keeping them secure was difficult, as Afghans gathered outside temporary holding facilities and clamored for blood. They had never much liked the foreigners, whose idea of Islamic law was sometimes harsher than even the Taliban's.

### Incentives

But Cuba wasn't much less chaotic. Interpreters were scarce; facilities were rudimentary, with buckets for drinking and urinating. Background information about anything -- detainees, Islam, Al Qaeda -- was hard to come by. The American military officers had been ordered to set up a prison at Guantanamo practically overnight. Intelligence agents there were asked mainly to certify, in short order, that the president "had reason to believe" that each shackled man was involved in terrorism. The agents rapidly reported back, according to *New York Times* accounts of that time, that they didn't have enough information to do even that.

"If we had any information, many times [the detainees] had multiple identities and multiple passports," recalled Army Maj. Gen. **Michael Dunlavey**, who headed the interrogation effort at Guantanamo through November 2002.

So the interrogators started asking routine questions of all the prisoners; many of the sessions were documented in FBI memos released to the American Civil Liberties Union under a Freedom of Information Act lawsuit last year: Where are you from? Why were you in Afghanistan? What do you think of jihad, of Osama bin Laden? When did you hear about 9/11? What do the detainees talk about? What do you know of attacks

planned on the United States? Have you heard whispers about attacking the Guantanamo guards? Do you know any of the other detainees? More than 24,000 interrogations have now taken place among the 800 men who have been held at The Bay.

The prisoners were shown photographs, too, large books containing mug shots of all the men held at Guantanamo: Do you recognize any of these men? Can you tell me about them?

If a man talked, if he cooperated, he received rewards: tobacco, a game of chess, a milk shake, free time in a room with movies and books, the chance to have a countryman put into the neighboring cell to ease the loneliness, a promise of a return home. Simply attending a Qaeda training camp before 9/11, an FBI interrogator told a detainee, "did not constitute a crime." Just talk to us, was the interrogators' refrain.

But many of the men wouldn't talk, according to Dunlavey. Citing the so-called "Manchester document," a Qaeda training manual discovered in England that advises captured jihadists to lie about their identity, stick to a cover story, and claim torture, Dunlavey said: "They followed it to a 'T.' "

The Americans came up with inducements for those who wouldn't talk: A prisoner could be chained in a strobe-lit room with Metallica or **Britney Spears** playing at full volume; interrogated for 16 hours straight; awakened every few hours for a move to a new cell; questioned while shivering in full-blast air conditioning; stroked by a woman who whispered that his situation was hopeless. In July of last year, the Defense Department released a report on allegations of abuse at Guantanamo Bay: All of the above tactics were used, and were acceptable at the time, according to the report. Other tactics deemed unacceptable were also used, according to the report, FBI memos, and the International Committee of the Red Cross.

For one special prisoner who wouldn't talk, interrogators employed further inducements. Detainee 063, a Saudi, had stubbornly claimed that he had gone to Afghanistan merely for love of falconry. By July 2002, the FBI knew that in August 2001 he had flown from a foreign country to Orlando, where a customs agent turned him away while a cohort, **Mohamed Atta**, the lead 9/11 hijacker, waited for him outside. On August 8, 2002, Detainee 063 was moved into an "isolation facility," where he stayed for the next 160 days, his cell continually flooded with light, his only human contact with interrogators and guards. He was questioned for 18 to 20 hours a day for 48 out of 54 straight days; he was threatened with a menacing dog; he was forced to wear a bra while thong panties were placed upon his head; he was leashed and ordered to perform dog tricks; he was stripped naked in front of women; he was taunted that his sister and mother were whores and that he was gay. Most of these techniques would later show up in Iraq, at Abu Ghraib prison.

By late November 2002, an FBI agent wrote, Detainee 063, **Mohamed al-Kahtani**, was "evidencing behavior consistent with

> **F**arouq Ali Ahmed appears to be neither a terrorist nor an enemy. But he has spent the past four years behind bars, and no end to his captivity is in sight.

extreme psychological trauma (talking to nonexistent people, reporting hearing voices, cowering in a corner of his cell covered with a sheet for hours on end.)"

Think about it. Whether you know something or not, whether you did something or not, you know what the interrogators want you to say. You know what another has said about you, because that is the information being presented to you. Was it the truth? Was

it a lie? Did you simply have the bad luck to be the mug shot under a finger when another inmate wanted to end the endless questions?

You've been told that the truth will set you free, but while interrogators come and go, you don't know anyone from your home country who has been released. Say one thing, and you might have a cigarette and a night's sleep. Say nothing, and you might spend the night shackled to the floor with Metallica ringing in your ears. Stay neutral, and it's more endless days of monotony, washing on command, exercising on command, eating on command, losing your mattress and blanket if you argue with the men in command.

What would you do?

### Farouq's Review

On September 27, 2004, Detainee 032, Farouq Ali Ahmed, presented his case to Combatant Status Review Tribunal Number 8. He came alone except for a U.S. military officer, his designated "personal representative." Rules forbid detainees from having attorneys at the tribunal proceedings, although a practicing lawyer of the Judge Advocate General's Corps, the military's legal service, generally presents the government's case.

Farouq stood accused of being associated with the Taliban and of having been a member of Al Qaeda. The government's case cited the following:

- Detainee admitted to giving his passport to a person known by him to be a member of the Taliban.

- Detainee admitted to lodging at an official Taliban residence in Kabul, with a Taliban representative he met in Quetta, Pakistan.

- Detainee was observed carrying an AK-47 and wearing fatigues at Osama bin Laden's private airport in Kandahar, Afghanistan.

- Detainee was captured by Pakistani forces as part of an organized group of 30 mujahedeen after the fall of Tora Bora.

The first two assertions, pointing toward Farouq's association with the Taliban, came from his own interrogations, when he said he wasn't sure, but, yes, the man who took him to Kabul and the men in the house where he stayed were probably members of the Taliban. The last two charges, suggesting that he was associated with Al Qaeda, Farouq flatly denied. He insisted that he was never at an airport, that he never carried a gun, and that he was captured alone. It was hard for him to disprove the charges, however: The details of the accusations were classified. He wasn't allowed to see them, and he wasn't told where they had come from.

The vote by the three-member tribunal was unanimous. Detainee 032 was properly designated as an enemy combatant because "he supported both Al Qaeda and Taliban forces engaged in hostilities against the United States or its coalition partners."

How could the officers on the tribunal vote otherwise? Soldiers are soldiers, not judges. As soldiers, their lives are on the line, they make hard battlefield decisions, and they are trained to follow orders.

The orders given to the Combatant Status Review Tribunals were as follows: The men coming before them had been determined to be enemy combatants, "through multiple levels of review by military officers and Officials of the Department of Defense." The government's evidence in support of "a determination that the detainee is an enemy combatant" was subject to a rebuttable presumption that it was "genuine and accurate" --

in other words, the government's case was presumed to be true unless the detainee could prove otherwise. The orders did not explain how a man could rebut evidence if he wasn't allowed to know the details or source of that evidence.

The officers serving on the tribunals were told that a handful of prisoners released long before the tribunals began had subsequently appeared in battle, one bragging of how he had convinced the Americans that he was a goat farmer. The officers' friends and colleagues in uniform were dying every week in Iraq, every month in Afghanistan.

And many, many prisoners had said they had gone to Afghanistan to teach the Koran. "That's part of the 'Big Lie,'" Gen. Dunlavey said, when a reporter outlined Farouq's case to him. How in the world, the general asked, can an Arabic speaker teach the Koran to people who don't speak Arabic? "That's like saying I'm going to memorize the Bible in Hebrew, and then I'm going to the U.S. to teach it to the common masses," Dunlavey said.

Many of the foreigners in Afghanistan said they came to teach the Koran, the general continued, a claim he could debunk by asking more questions, as any good commander mindful of his men's lives would do. "I would ask immediately, do you speak the language? No? How do you communicate? Where was your supply of Korans? Where did you learn to teach? There was no purpose, nothing that could be verified, there was no backup on it."

But Muslims believe that the Koran is the direct word of God, as uttered in Arabic by Muhammad, according to **Akbar Ahmed**, chair of Islamic studies at American University. Islam, unlike Christianity, is not based on accounts written by disciples years after the prophet died. Muslims believe that every word in the Koran came from Allah's lips to Muhammad's ears. That's why every Muslim prays five times a day in the same haunting Arabic syllables. That's why Taliban textbooks, such as they were, were written in Dari and Pashto -- except for the Koranic texts, which were in Arabic. That's why the Koran is taught through recitation. And that's why Muslims who don't understand another word of Arabic memorize, in their entirety, the sounds of God in Arabic.

And that's why Farouq Ali Ahmed went to Afghanistan in the spring of 2001, according to two individuals who reviewed his entire file, including the classified sources and details of the evidence against him.

Farouq's personal representative, an Army officer, was disgusted with the tribunal's verdict. He took the unusual step of submitting a written protest, a redacted version of which was filed with Farouq's habeas proceedings.

The government's sole evidence that Farouq had been at bin Laden's airport in Kandahar was the statement of another detainee. The Army officer, a lieutenant colonel, had given the tribunal an FBI memo indicating that the other detainee had lied, not only about Farouq, but about other Yemeni detainees as well. The other detainee claimed he had seen the Yemenis at times and in places where they simply could not have been.

"I do feel with some certainty that [the accuser] has lied about other detainees to receive preferable treatment and to cause them problems while in custody," the lieutenant colonel wrote. "Had the tribunal taken this evidence out as unreliable, then the position we have taken is that a teacher of the Koran (to the Taliban's children) is an enemy combatant (partially because he slept under a Taliban roof.)"

### What Have We Done?
Farouq's habeas attorneys are Covington and Burling's David Remes and **Marc Falkoff**, a young associate who had abandoned pursuit of a Ph.D. in literature because he found

academia" too political" but who brought 17 Guantanamo cases to the prestigious firm. The lawyers provided *National Journal* with the declassified versions of letters they wrote on behalf of 10 detainees, after viewing their classified files, to the Administrative Review Board. After a Combatant Status Review Tribunal designates a Guantanamo prisoner as an enemy combatant, he goes before the review board, which decides whether he should be released because he is no longer a threat to America.

"Farouq is not now and never has been associated with Al Qaeda," the letter from his attorneys read. "The only evidence of such an association comes from a proven liar and from another detainee who was abused and coerced into making statements inculpating other men." The identity of the "proven liar," the man also referred to in Farouq's personal representative's memo, was redacted from the attorneys' letter, but that of the "abused and coerced" detainee was not: Detainee 063, Mohamed al-Kahtani. At some point after facing a snarling dog, donning women's underwear, and gibbering under a sheet, Kahtani had apparently pointed to a mug shot of Farouq and said he was one of the 30 mujahedeen intercepted at the border after the battle of Tora Bora.

The Covington and Burling lawyers flew to Yemen to meet with Farouq's family, a step the Defense Department had not taken. Farouq's account of how he came to Afghanistan, they wrote to the board, was the truth.

Farouq wasn't the only one of the lawyers' clients fingered by Kahtani. Remes and Falkoff cited Detainee 063 as a source of the allegations against two of their other clients, as well. In the cases of two clients, including Farouq, they cited the same snitch identified in Farouq's personal representative's memo as the source of allegations. On behalf of another detainee, the lawyers identified yet another snitch, who had reportedly told tales during physically severe questioning in Afghanistan.

Falkoff and Remes, who looked into all of their clients' stories in Yemen, maintain that none of them ever fought against America or ever thought to fight against America. The men's families, in contact with their loved ones only through Red Cross letters passed through U.S. military censors, had independently given the lawyers accounts of how the men came to be in Afghanistan that matched the stories later revealed in U.S. government files. There was the medical assistant who had previously worked in his brother's clinic in Yemen and went to Afghanistan to work in a civilian clinic; the boy who went to Afghanistan to get training to fight in Yemen's tribal wars; the four men who were told that the Taliban was building a good Islamic society and so went to defend their Muslim brothers against the murderous warlords of the Northern Alliance; the man who had imported medicine for a charity in Afghanistan whose local outposts -- but not the one where he worked -- were later linked to Al Qaeda. All the tales checked out, the two lawyers say.

Sure, the men and their families could have worked out these cover stories in advance. Or the stories could be true. It doesn't matter. Once in Guatanamo, by virtue of having been Arabs in Afghanistan (except for the man who was asleep at home in Pakistan), the men became enemy combatants and so found themselves beyond the reach of the American courts, and even beyond the law of war, with its Geneva Convention protections.

Four years later, they are still there. That's what happens when a man is presumed guilty until proven innocent; when associating with people who associate with bad people is sufficient grounds for guilt; when hearsay statements, whether offered from truth, coercion, or boredom, are taken as genuine until proven otherwise; when being on the wrong side of a local war when America enters the picture is proof of fighting against America; when U.S. military commanders charged with keeping us safe from harm are asked to sit in judgment.

"Indeed, the evidence considered persuasive by the tribunal is made up almost entirely of hearsay evidence recorded by unidentified individuals with no firsthand knowledge of the events they describe," wrote Cmdr. **James Crisfield**, a Navy judge advocate general and the legal adviser to the Combatant Status Review Tribunals, in response to one tribunal decision. Crisfield scolded the tribunal for rejecting a detainee's request that a witness be allowed to present hearsay evidence. "There should not be a double standard for the government's ability to present hearsay and the detainee's ability to present hearsay evidence."

On October 21, 2005, Farouq went before the Administrative Review Board, whose officers are charged with assessing whether an enemy combatant still presents a threat to America. As it happened, Farouq's attorneys were in Guantanamo that day, but his request that they be allowed to accompany him was denied.

The board told Farouq that a new piece of evidence had turned up against him, he later told his lawyers. Somebody had said, at some point in the past four years, that they had heard the name "Farouq" over a walkie-talkie during the battle of Tora Bora.

That may have happened. In fact, it probably did happen. The name "Farouq" is as common in the Arab world as "George" is in America. It's a first name, in fact, that is shared by the foreign minister of Syria, the culture minister of Egypt, the political director of the Palestinian Fatah party, the major general in charge of earthquake relief in Pakistan. And it is the last name of a top Qaeda operative who had escaped from the Bagram air base in July 2005.

The Defense Department, following orders and procedures, still considers Farouq Ali Ahmed, Detainee 032, a threat to America. Two months after his review board, on December 18, Farouq turned 22, passing his fourth straight birthday behind bars in Guantanamo.

Who would do differently? Who would raise their hand to release the man who might fly into the next skyscraper?

## Policy Council: Sponsored Links

The organizations below are paying members of National Journal's Policy Council. These links, which are included based on relevance to this article, do not involve the National Journal Group editorial staff.

### American Civil Liberties Union

·Oppose the Proposed Changes to the McCain Anti-Torture Amendment and the Graham Court-Stripping Amendment
·Letter to Representative Markey Urging Passage of the Torture Outsourcing Prevention Act

### Senate Republican Policy Committee

·Guantanamo Bay Detentions Comply with Domestic and International Law

### National Association of Counties

- Loss of Federal Entitlement Benefits

## National Association of Broadcasters

- An Anti-Stripping Digital Multicast Requirement Would Not Violate the First and Fifth Amendments

## Brookings Institution

- Between the Global and the Local: Islamism, the Middle East, and Indonesia

---

**Need A Reprint Of This Article?**

National Journal Group offers both print and electronic reprint services, as well as permissions for academic use, photocopying and republication. Click here to order, or call us at 877-394-7350.

[ E-mail NationalJournal.com ]
[ Site Index | Staff | Privacy Policy | E-Mail Alerts ]
[ Reprints And Back Issues | Content Licensing ]
[ Make NationalJournal.com Your Homepage ]
[ About National Journal Group Inc. ]
[ Employment Opportunities ]

Copyright 2006 by National Journal Group Inc.
The Watergate · 600 New Hampshire Ave., NW
Washington, DC 20037
202-739-8400 · fax 202-833-8069
NationalJournal.com is an Atlantic Media publication.