*Approved for Public Filing by CSO*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————
                                    )
**ALLA ALI BIN ALI AHMED**,         )
also listed as ALI BIN ALI ALEH;    )
                                    )
and                                 )
                                    )
**Wagdi Ali Bin Ali,**              )
as Next Friend of                   )
Alla Ali Bin Ali Ahmed;             )
                                    )
            *Petitioners,*          )
                                    )
            *v.*                    )  **CIVIL ACTION NO. 05-CV-01678 (GK)**
                                    )
**GEORGE W. BUSH**, *et al.*,       )
                                    )
            *Respondents.*          )
—————————————————————)


### PETITIONERS' OPPOSITION TO GOVERNMENTS MOTION
### TO EXAMINE PRIVILEGED COMMUNICATIONS SEIZED
### WITHOUT NOTICE OR APPROVAL AND MOTION TO SHOW CAUSE
### <u>WHY RESPONDENTS SHOULD NOT BE HELD IN CONTEMPT</u>

**TABLE OF CONTENTS**

I.    INTRODUCTION ...............................................................................................1

II.   ARGUMENT ....................................................................................................3

     A.    The Government Should Be Sanctioned for Seizing the Prisoners' Legal Papers Without Notice and Approval ................................................................3

     B.    The Premise of the Government's Investigation Is Invalid, and Its Motion Is Premature at Best ....................................................................................6

     C.    The Government's Seizure and Examination of Petitioners' Legal Papers Was Unlawful ...........................................................................................10

          1.    The Government Has Long Sought to Thwart the Attorney-Client Relationship ............................................................................11

          2.    The Prisoners' Legal Papers May Not Be Seized and Reviewed Without an Individualized Showing of Probable Cause ...........................................12

          3.    The Government Has Made No Such Individualized Showing ................16

     D.    Any Further Review of the Prisoners' Legal Papers Should Be by This Court or a Special Master ........................................................................20

III.  CONCLUSION ................................................................................................24

# TABLE OF AUTHORITIES

*Adem v. Bush*, 425 F. Supp. 2d 7 (D.D.C. 2006) ..........................................................11

*Al Odah v. United States*, 346 F. Supp. 2d 1 (D.D.C. 2004) ..........................12, 14, 19, 20, 21, 22

*Bach v. Illinois*, 504 F.2d 1100 (7th Cir. 1974) ..........................................................13

*Black v. United States*, 172 F.R.D. 511 (S.D. Fla. 1997).............................................20

*Carter v. Hutto*, 781 F.2d 1028 (4th Cir. 1986) .........................................................13

*Doe v. United States*, No. 03-6145, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) ..........................15

*Goff v. Nix*, 113 F.3d 887 (8th Cir. 1997) ...............................................................13

*In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32 (2d Cir. 1986) ......................................15

*In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275
    (6th Cir. July 13, 2006) ............................................................................20

*Hiney v. Wilson*, 520 F.2d 589 (2d Cir. 1975) ..........................................................13, 14

*Johnson-El v. Schoemehl*, 878 F.2d 1043 (8th Cir. 1989) .................................................13

*Lanza v. New York*, 370 U.S. 139 (1962)..................................................................12

*McCreary County v. ACLU*, 125 S. Ct. 2722 (2005)........................................................11

*Procunier v. Martinez*, 416 U.S. 396 (1974) ...............................................................13

*Rasul v. Bush*, 542 U.S. 466 (2004).......................................................................11

*In re Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995).........................................................15

*In re Sealed Case*, 107 F.3d 46 (D.C. Cir. 1997)..........................................................15

*In re Search of the Scranton Housing Authority*, No. 04-MISC
    Nos. 318-322, 2006 WL 1722565 (M.D. Pa. June 22, 2006) ...........................................20

*In re Search Warrant for Law Offices*, 153 F.R.D. 55 (S.D.N.Y. 1994)......................................21

*Simmons v. Dickhaut*, 804 F.2d 182 (1st Cir. 1986)......................................................13

*Swidler & Berlin v. United States*, 524 U.S. 399 (1998) ................................................................12

*United States v. Abbell*, 914 F. Supp. 519 (S.D. Fla. 1995)........................................................20

*United States v. Grant*, CR 207, 2004 WL 1171258 (S.D.N.Y. May 25, 2004) ..........................16

*United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997) ...............................................................21

*United States v. Skeddle*, 989 F. Supp. 890 (N.D. Ohio 1997) .....................................................16

*United States v. Stewart,* No. CR 396 JGK, 2002 WL 1300059
    (S.D.N.Y. June 11, 2002).........................................................................................15, 21

*United States v. Zolin*, 491 U.S. 554 (1989) ...............................................................................16

*Upjohn Co. v. United States*, 449 U.S. 383 (1981)......................................................................12

*Wright v. Newsome*, 795 F.2d 964 (11th Cir. 1986) ....................................................................13

## I.    INTRODUCTION

The government's motion should be denied.  The materials in question are privileged

attorney-client communications.  As a matter of fundamental principle, and by specific order of

this Court, those communications were supposed to be secure against seizure and review by the

government.  The government's seizure and review of those communications, without prior

notice to and approval by this Court, and without notice to counsel, was improper.  The

government's failure to disclose its actions to this Court and counsel until nearly a month after

the fact is deplorable, to say the least.  In the name of investigating three prisoner deaths, the

government has violated a fundamental privilege and shattered any confidence the prisoners

might still have had that their communications with their counsel would be safe from the

government's prying eyes.  The American Bar Association has called for an investigation of the

military's massive breach of the privilege.[1]

Moreover, there is no evidence that Alla Ali Bin Ali Ahmed has done *anything*

individually to warrant the seizure of his attorney-client communications.  The government has

presented no evidence that Ali Ahmed knew those who committed suicide, that his attorney-

client communications were used to communicate with those who committed suicide, or any

other evidence linking Ali Ahmed to the suicides.  Furthermore, there is no evidence suggesting

that Ali Ahmed is at a high risk of committing suicide himself or has engaged in any improper

behavior at Guantanamo (or otherwise).  Ali Ahmed – a 23 year old student of Islamic studies –

has been making the most of the situation handed to him and has been attempting to pursue a

---

[1]    *See* Letter dated July 11, 2006, from Michael S. Greco, President, American Bar Association, to Senators Arlen Specter and Patrick Leahy (Ex. A hereto).

1

legitimate legal course of action, his most recent legal battle being over the right to require production of a factual return.

The stakes are too high for this Court simply to accept the factual assertions that form the basis of the instant motion.  The government claims that the privileged communications were seized and examined in the course of an investigation into the suicide deaths of three prisoners; but, without independent verification, this Court cannot be certain that the deaths *were* suicides. The government claims that the initially seized and reviewed privileged communications supported the wholesale seizure and review of all privileged communications; but, without examining the communications, this Court cannot be certain *what* any of the seized materials contained.

The government's proffered justifications for seizing and reviewing privileged communications may be valid.  At present, there is no basis for alleging, and we emphatically do not allege, that the prisoner deaths were not suicides.  On the other hand, the government's proffered justifications also may be nothing more than an excuse for collecting "prisoner intelligence" and further impairing the attorney-client relationship  Experience teaches that the military is not invariably forthcoming.  This Court has only the government's account of what has happened.  In view of the privilege at issue, this Court cannot afford simply to take the government at its word.

This Court should order the government to show cause why it should not be sanctioned for seizing and reviewing the legal papers of Detainee Alla Ali Bin Ali Ahmed and other prisoners[2] without prior approval of this Court and notice to counsel, and for failing to report its

---

[2]     *See* Kisthardt Decl. ¶ 4 (The NCIS search included handwritten materials "in all enemy combatant detainees' cells through the Guantanamo detention facility" beginning on June 14, 2006.  On the same date, "the NCIS team recovered personal items and papers, including
*(Footnote continued)*

2

actions to this Court and counsel until nearly a month after the fact. This Court should also

investigate how the Department of Justice allowed this massive breach of the attorney-client

privilege to occur and should prescribe procedures to prevent breaches of the privilege in the

future. Finally, this Court should order the government to return the prisoners' legal papers to

counsel and destroy any copies. If this Court decides to allow any further review, the

government should not be allowed to use such review as a fishing expedition. Any such review

should be conducted in the first instance by this Court or a special master without the

involvement of the military or the Department of Justice.

II.    ARGUMENT

    A.    **The Government Should Be Sanctioned for Seizing the Prisoners' Legal Papers Without Notice and Approval**

On June 10, 2006, the military reported that three prisoners at Guantánamo Bay had been

found dead in their cells with wads of cloth stuck in their mouths.[3] The military reported the

prisoners' deaths as suicides.[4]

---

legal material and other correspondence" and have now collected approximately 1100 pounds of
materials and documents. "The materials collected from each detainee's cell and effects were
separately bagged for eventual sorting and review.").

[3]    Colonel Mike Bumgarner, the commander of the prison, stated in an interview
that each of the prisoners was found with "a large wad of cloth in his mouth"; Colonel
Bumgarner stated that he "did not know if the material was for choking or to muffle their voices
while they took their lives." Michael Gordon, *Officer Expects More Suicide Tries*, Charlotte
Observer, June 12, 2006, *available at* http://www.charlotte.com/mld/charlotte/news/
14797522.htm.

[4]    U.S. Southern Command News Release, *Three Detainee Deaths at Guantanamo
Bay*, June 10, 2006, *available at* http://www.southcom.mil/pa/Media/Releases/USSOUTHCOM
%20PRESREL%20Detainee%20Death%20FINAL%20%20(1415%2010%20Jun%2006).doc;
*Gen. John Craddock's Opening Statement*, Press Conference, June 10, 2006, *available at*
http://www. southcom.mil/pa/News/June%202006/News060610-001.htm; Sara Wood, *Three*

*(Footnote continued)*

3

In his news conference, Navy Rear Admiral Harry B. Harris, the commander of Joint Task Force–Guantánamo, denounced the deaths as acts of war: "I believe this was not an act of desperation, but an act of asymmetric warfare aimed at us here at Guantánamo," he said. "We have men here who are committed jihadists. They are dangerous men and they will do anything they can to advance their cause."[5] Colleen Graffy, Deputy Assistant Secretary of State for Public Diplomacy, called the deaths "a good PR move."[6]

According to the declarations of Admiral Harris and Special Agent Carol Kisthardt, the Naval Criminal Investigative Service (NCIS) initiated an investigation to determine "the manner and cause of death" of the three prisoners."[7] Autopsies were to be performed, but results have not been made public.

Now, nearly a *month* later, the government has disclosed that, between June 10 and June 14, as part of the purported "investigation," NCIS seized and examined over a half-ton of written communications between Guantánamo prisoners and their lawyers.[8] The government claims that it seized the prisoners' legal papers because notes found in the cells of the dead prisoners

---

*Guantanamo Bay Detainees Die of Apparent Suicide*, June 10, 2006, *available at* http://www.defenselink.mil/ news/Jun2006/20060610_5379.html.

[5] *Id.* Admiral Harris has stated: "Asymmetrical warfare is the idea that in a war between two entities, the lesser entity will use completely unorthodox and perhaps illegal means to try to gain an upper hand or the upper hand." Transcript, *Inside Guantanamo*, Fox News Network, June 12, 2006.

[6] Peter Graff, *U.S. Rows Back From Guantanamo Suicide Comments*, June 12, 2006 (Reuters), *available at* http://www.cageprisoners.com/articles.php?id=14438; *see also* Reuters, *Three Guantanamo Detainees Die, US Army*, June 11, 2006. *available at* http://www.cageprisoners.com/articles.php?id=14371.

[7] Harris Decl. ¶ 2; Kisthardt Decl. ¶ 2.

[8] Kisthardt Decl. ¶¶ 2-5.

suggested that the prisoners might have used the cloak of the attorney-client privilege in furtherance of a suicide "plot" by the prisoners, perhaps "encouraged, ordered, or assisted by third parties."[9] There is no way to know whether the notes suggested such use of privileged communications or, if they did, whether that was the actual reason for the government's subsequent actions.

The government seized and examined these privileged communications over a five-day period without court approval or supervision, and without prior notice to the prisoners' counsel, and then waited nearly a month before disclosing its actions to this Court and counsel. The government's seizure and examination of these materials violated not only this Court's orders directing the government to respect the attorney-client privilege but also the Protective Order entered by this Court to ensure the protection of that privilege.

Having belatedly disclosed its illegal seizure and examination, the government now asks this Court to condone its actions and permit it to retain the seized materials and examine them even more closely. It comes as no surprise that the government sought judicial sanction for its actions only after habeas counsel, informed of the government's actions by their clients, began to seek relief from this Court.[10] The government obviously foresaw a deluge. True to the adage that the best defense is a good offense, the government now seeks to preempt further requests for relief by obtaining blanket *post hoc* court approval of its actions.

---

[9]     Harris Decl. ¶ 4.

[10]     Mot. To Modify Stay To Direct Resp'ts To Return Impounded Privileged Legal Material and for Other Relief, *Abdullah v. Bush*, No. 05-00023 (RWR) (filed July 5, 2006). The government states that its instant motion is an opposition to the *Abdullah* motion. U.S. Mot. at 1 n.1.

The fact that Petitioners' legal papers were seized over a five-day period demonstrates that no exigent circumstances required the government to act without first seeking the approval of this Court and notifying counsel. At the very least, a conference call with counsel and this Court on June 10, the day of the prisoner deaths, could have been arranged. *See* LCvR 40.1(c), 65.1, 57.8. The Department of Justice either approved the military's seizure of privileged legal materials without notice or court approval, or failed to have in place procedures to prevent what happened from occurring. The Department's failure to disclose the government's actions until the *Abdullah* motion forced its hand suggests that the Department was a full partner in the military's breach of the privilege. This Court should sanction the government for its unilateral and improper conduct.

**B.     The Premise of the Government's Investigation Is Invalid, and Its Motion Is Premature at Best**

This Court should not allow the government to examine the seized materials on the premise that the three prisoners' deaths, if suicides, were acts of "warfare" or "a good PR move," or that prisoners may be "plotting" to take their own lives. The situation that the prisoners confront – they have spent more than four years imprisoned on an isolated island, charged with no offense, not knowing the evidence against them, subject to brutal and contemptuous treatment by their keepers, suffering from medical neglect, with no end in sight – would be sufficient to account for any suicidal acts.

The government's attempt to portray prisoner deaths as acts of warfare is a transparent effort to obscure that fact and avoid the government's underlying responsibility for the prisoners' conditions. The government's claims of suicide "plots" among the prisoners, possibly implicating "third parties," are now being used as an excuse for seizing and examining privileged communications. The prisoners have long engaged in coordinated "self-harm" activity, from

6

hunger strikes to mass hangings.  The government, however, has consistently sought to minimize

such concerted activity.[11]  The government's history of indifference contrasts with its current

contention that the search for further "plots" justifies ransacking prisoners' legal papers.

If prisoners take their own lives at Guantanamo, it is because of the hopelessness of their

situation and, at least in some instances, the effect of the government's interrogation techniques

on their mental health.  Breaking the prisoners' spirits and psyches for the purpose of collecting

intelligence is Guantanamo's *raison d'etre*.  As Physicians for Human Rights has stated,

"psychological torture [is] central to the interrogation process and reinforced through conditions

of confinement."[12]

Prisoners have also been subjected to a variety of other cruel, inhuman, and degrading

treatment, including prolonged exposure to extreme heat and cold, religious humiliations

(including abuse of the Koran and interference with prayers), threats of execution, threats against

family, and prolonged solitary confinement.  The classified 50-day interrogation logs of one

"high value" prisoner, published last year by *Time*, disclose terrors from which no human could

---

[11]    *See* Mark Denbeaux, *Report: The Guantánamo Detainees During Detention* (July 10, 2006), at 17–18 (Ex. B hereto).

[12]    Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by US Forces* 1 (2005).  Approved interrogation techniques have included "Removal from social support at Camp Delta"; "Segregation in Navy Brig"; "Isolation in Camp X-Ray"; "Deprivation of light"; "Inducing stress [through] use of female interrogator"; "Up to 20-hour interrogations"; "Removal of all comfort items, including religious items."  Dep't of Defense, *GTMO Interrogation Techniques* (June 22, 2004). Evidence indicates that the government has also used even more brutal techniques, labeled "Fear Up Harsh," "Sleep Adjustment," and "Futility."  Dep't of Defense, *Working Group Report on Detainee Interrogations in the Global War on Terrorism:  Assessment of Legal, Historical, Policy, and Operation Considerations* at A1-A3 (2003), *available at* http://www.ccr-ny.org/v2/reports/docs/ PentagonReportMarch.pdf.

be expected to emerge mentally intact.[13]  Government doctors "assisted in the design of interrogation strategies, including sleep deprivation and other coercive methods tailored to prisoners' medical conditions.  Medical personnel also coached interrogators on questioning technique."[14]

Predictably, these tactics have caused the mental health of many Guantánamo prisoners to deteriorate.  According to government data, prisoners committed 350 acts of "self-harm" in 2003, of which 120 were attempted hangings.[15]  In August 2003, 23 men attempted to hang

---

[13]      According to the interrogation logs, authorities held this prisoner in solitary confinement until he became delusional; subjected him to weeks of interrogations lasting 18 to 20 hours a day; made him bark, growl, and perform dog tricks; forced him to wear a woman's bra and placed a thong on his head; menaced him with dogs; hydrated intravenously and then denied access to a toilet; and, even after his heartbeat had slowed to 35 beats per minute and he was placed in a doctor's care, played screaming loud music in his cell to "prevent detainee from sleeping."  *See* Interrogation Log, Detainee 063, *available at* http://www.time.com/time/2006 /log/log.pdf. The Deputy Assistant Director of the FBI complained to the Pentagon about this treatment after finding this prisoner in his cell "evidencing behavior consistent with extreme psychological trauma (talking to non-existent people, reporting hearing voices, crouching in a corner of the cell covered with a sheet for hours on end)."  Letter from T.J. Harrington, Dep'y Assist. Dir., FBI Counterterrorism Div., to Maj. Gen. Donald J. Ryder, U.S. Army (July 14, 2004).

[14]      M. Gregg Bloche & Jonathan H. Marks, *When Doctors Go to War*, New Eng. J. Med., Jan. 6, 2005, at 3.  According to the British medical journal *The Lancet*, "medical records [have been] routinely shared with interrogators in clear breach of confidentiality and with the knowledge that such information can be misused[,] despite objections by the medical team of the International Committee of the Red Cross." Editorial, *How Complicit are Doctors in Abuses of Detainees?*, The Lancet, Aug. 21, 2004, at 637; *see also* Jane Mayer, *The Experiment*, New Yorker, July 11 & 18, 2005, *available at* http://www.cageprisoners.com/downloads/Mayer.pdf. The American Medical Association ("AMA") and American Psychiatric Association ("APA") have now adopted ethical guidelines that limit participation in interrogation.  *See* AMA, *New AMA Ethical Policy Opposes Direct Physician Participation in Interrogation*, June 12, 2006, *available at* http://www.ama-assn.org/ama/pub/category/16446.html; APA, *APA Statement on Psychiatric Practices at Guantanamo Bay*, June 27, 2005, *available at* http://www.psych.org/ news_room/press_releases/05-40psychpracticeguantanamo.pdf.

[15]      Denbeaux, *supra* note 11, at 6.

themselves.[16]  The government chose to describe all but two of these hangings as incidents of

"manipulative self-injurious behavior," rather than as suicide attempts.[17]  In 2004, also according

to government data, prisoners committed another 110 acts of "manipulative self-injurious

behavior," though it did not report how many of these 110 incidents were attempted hangings.[18]

Even with its penchant for defining away suicides as "manipulative self-injurious behavior," the

government has acknowledged that 29 prisoners have attempted suicide a total of 41 times.

        Once habeas counsel started meeting with their clients and began to recognize the

depressive symptoms they had developed, they made repeated requests of the Department of

Justice to bring outside doctors to the prison to perform independent medical examinations of

their clients.  All such requests, including requests for the release of their clients' medical

records, were refused.

        The results were foreseeable.  Last fall, counsel for Jumah al Dossari found his client

hanging from the wire meshing of an interview cell, his wrist slashed and a pool of blood

gathering under his body.  Previously, Mr. Dossari's counsel had sought an injunction requiring,

among other things, access to his client's medical records.  The government opposed this motion,

claiming that the "the Guantánamo medical staff provide appropriate medical and mental health

services to all prisoners through a thorough, coordinated team approach, based on individualized

treatment plans that account for each patient's conditions and circumstances."[19]

---

[16]        *Id.*

[17]        *Id.* at 14.

[18]        *See id.* at 6.

[19]        Gov. Opp'n to Mot. for TRO & Prelim. Injunction, *Almurbati v. Bush*, No. 04-
1227 (RBW) (filed Nov. 16, 2005) at 10.

On May 18, 2006, four more prisoners reportedly attempted suicide by overdosing on medicines they had hoarded, but in a statement released the following day, Commander Harris stated that only two of these efforts were counted as "suicide attempts," apparently because only two prisoners lost consciousness due to their attempts.[20]  Two others complained of dizziness and nausea, one claiming that he had attempted suicide but did not have enough pills.  These latter two received a medical and psychiatric evaluation, but Commander Harris called these prisoners "attention-seeking sympathizers who were not trying to actually commit suicide."[21]

Less than a month later, on June 10, 2006, the three deaths that led to the instant motion occurred.  In light of the history, purpose, and nature of Guantánamo, it is impossible to support the government's reflexive assertion that the deaths were acts of belligerence rather than of despair.  At the very least, the government must demonstrate to the court a factual basis to support its assertion that these deaths *were* suicides before it engages in the wholesale seizure of privileged papers as part of an investigation of a suicide "plot."

## C.    The Government's Seizure and Examination of Petitioners' Legal Papers Was Unlawful

This Court has ruled that prisoners held at Guantánamo have a right to representation by and access to counsel.  This Court has recognized that the attorney-client privilege attaches to communications between the prisoners and their lawyers, and it has gone to great lengths to protect that privilege by creating access procedures protecting the confidentiality of attorney-

---

[20]    Kathleen T. Rehm, *Skirmish With Guards, Two Suicide Attempts Test Guantanamo Procedures*, May 19, 2006, *available at* http://www.defenselink.mil/news/ May2006/20060519_ 5177.html.

[21]    Dep't of Defense, *Statement on Suicide Attempts at Guantanamo*, May 19, 2006, *available at* http://www.southcom.mil/PA/Media/Releases/Media%20Advisory%20-%205-19- 2006% 20-%201%20-%20Press%20briefing.pdf.

client communications.  This Court should not ratify the government's violations of this Court's orders by permitting it to review further the privileged communications that it has seized.

1.     **The Government Has Long Sought to Thwart the Attorney-Client Relationship**

As the Supreme Court has noted in different context, "the world is not born anew each morning."[22]  When it comes to undermining the attorney-client relationship at Guantánamo, the government is a repeat-offender.  This Court should consider the government's recent actions, and its instant motion, in light of its five-year campaign to thwart that relationship.

Most of the prisoners at Guantánamo have been held there for over four years.  Four-and-a-half years ago, when the first next-friend habeas petitions were filed on behalf of prisoners, the government responded by asserting that the prisoners had no right to seek relief in federal court and no rights for a federal court to enforce.  While these issues were being litigated, the government denied the prisoners access to counsel.

In 2004, the Supreme Court rejected "the proposition of Guantánamo Bay as a legal black hole."[23]  Unfazed, the government insisted that "detainees' access to counsel existed purely at the pleasure of the government, with restrictions to be imposed as it saw fit."[24]  Judges of this Court "flatly rejected" the government's position and its effort to impose "significant restrictions on attorney-client communications, including real-time monitoring of counsel meetings with detainees."[25]

---

[22]     *McCreary County v. ACLU*, 125 S. Ct. 2722, 2736 (2005).

[23]     *Adem v. Bush*, 425 F. Supp. 2d 7, 11 (D.D.C. 2006) (citing *Rasul v. Bush*, 542 U.S. 466 (2004)).

[24]     *Id.* at 12.

[25]     *Id.* at 11–12.

11

Once counsel began to meet with their clients, the government immediately began undermining the attorney-client relationship. Interrogators fueled mistrust of the lawyers among the prisoners and punished prisoners for meeting with lawyers. For instance, interrogators told several Petitioners and other prisoners that their lawyers were spies. Interrogators asked other prisoners, "did you know your lawyers are Jews?"[26] and warned prisoners that they would never be released if they retained counsel. Immediately after they met with their lawyers for the first or second time, several Petitioners were forced to wear immodest clothing, subjected to extreme temperatures, or prohibited from praying. Several prisoners have had their legal papers searched.

2. **The Prisoners' Legal Papers May Not Be Seized and Reviewed Without an Individualized Showing of Probable Cause**

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law."[27] Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[28] As this Court has recognized in the context of the Guantánamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States."[29]

---

[26] Frank Davies, U.S. Interrogators Accused of Trying to Divide Detainees, Attorneys (Knight Ridder), May 13, 2005, *available at* http://www.commondreams.org/headlines05/0513-04.htm.

[27] *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[28] *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *see also Lanza v. New York*, 370 U.S. 139, 143–44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.").

[29] *Al Odah v. United States*, 346 F. Supp. 2d 1, 10 (D.D.C. 2004).

12

Nowhere is the effectuation of the privilege more important than in the context of pre-trial detention. "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important."[30]  For such prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."[31]  Even for prisoners convicted of crimes, the Supreme Court has held, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid."[32]

Seizure of legal papers is particularly egregious because it strikes at the heart of the attorney-client relationship and interferes with the inmate's access to the courts.  "The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts. . . . [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest."[33]

---

[30]     *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised.").

[31]     *Bach*, 504 F.2d at 1102.

[32]     *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).

[33]     *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted); *see also Simmons v. Dickhaut*, 804 F.2d 182, 183–84 (1st Cir. 1986) ("Many courts have found a cause of action for violation of the right of access stated where it was alleged that prison officials confiscated and/or destroyed legal materials or papers."); *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986) ("The allegation that prison officials seized [the plaintiff's] pleadings and law book and destroyed other legal papers clearly states a claim of denial of access to the courts."); *Carter v. Hutto*, 781 F.2d 1028, 1031–32 (4th Cir. 1986) (plaintiff alleged a valid claim of denial of access to courts when he alleged that his legal materials were confiscated or destroyed); *Hiney*

*(Footnote continued)*

The government's vague allegations of notes found in a dead prisoners' cell written by another prisoner cannot qualify as a "legitimate penological interest" in seizing *all* legal documents from *all* prisoners.  Seizing legal papers interferes with a prisoner's access to courts and chills the giving, receiving, and continued possession of communications from attorney to client, particularly when seized without notice to the prisoners' attorneys or the court.

This Court has recognized that the prisoners – who have not been tried and who seek the opportunity through their counsel to challenge the basis of their detention – have a right to counsel and are entitled to a confidential relationship with their counsel.  Over the government's objections, "[t]he Court [found] that Petitioners are entitled to be represented by counsel."[34] Thus, "the Court determine[d] that the government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them."[35]  Yet the government has decided, in the teeth of this decision, "to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communication between them."[36]

To give meaning to the attorney-client privilege in this context, this Court implemented Access Procedures which created avenues of confidential communication between prisoners and their attorneys by laying the ground rules for in-person meetings, and for written communication

---

*v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975) (alleged confiscation of legal papers would have denied plaintiff access to the courts).

[34]    *Al Odah*, 346 F. Supp. 2d at 5.

[35]    *Id*.

[36]    *Id*.

between these parties.  The government sought the ability to monitor these communications, but that request was squarely rejected by this Court.

The government's actions violated the Protective Order and accompanying Access Procedures.  The government does not attempt to justify its actions under the Protective Order, but rather admits that the seized materials "will likely include some number of attorney-client communications potentially subject to attorney-client privilege."[37]  But the government's unilateral abrogation of the privilege would have been unlawful even if it had not directly violated a Court order.  Abrogation of the attorney-client privilege in any context requires the government to make a specific, *individualized* showing that there is sufficiently compelling justification for invading the privilege.  For example, where the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing that the exception applies – i.e., that *that* client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act.[38]  Similarly, when the government seizes materials from a location that likely contains privileged papers, that seizure must be supported by probable cause and a warrant, and it still must employ appropriate means of screening out privileged materials.[39]

---

[37]     Resps.' Mot. at 9.

[38]     *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, No. 03-6145, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce).

[39]     *See, e.g.*, *United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

The government has not cited any cases that suggest the privilege may be invaded without an *individualized*, sufficiently rigorous showing that that materials of a particular client or particular attorney are likely to have been abused in furtherance of a crime.[40]  Even when such documents will be reviewed *in camera* by the court – and not by the government – "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."[41]

### 3.     The Government Has Made No Such Individualized Showing

The government has presented no specific evidence that any of Petitioners have misused their attorney-client materials.  Indeed, the government does not even purport to do so.  Four or five documents seized from just a few prisoners cannot justify seizing over half-a-ton of privileged materials from hundreds of prisoners.  In fact, there is absolutely no evidence demonstrating the relevance of Alla Ali Bin Ali Ahmed's attorney-client communications.  Ali Ahmed has not been shown to have misused his attorney-client materials in any way, and he has not been shown to exhibit any suicidal or even non-cooperative behavior.  He also has no motive to misbehave, individually or by virtue of helping other detainees; it is important for Ali Ahmed to go home as soon as possible so he can take care of his family because his father is ill.

---

[40]     *See, e.g.*, *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant"); *United States v. Grant*, No. 04 CR 207, 2004 WL 1171258, at *2 (S.D.N.Y. Dec. 14, 1982) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding of probable cause").

[41]     *United States v. Zolin*, 491 U.S. 554, 572 (1989) (quotations and citations omitted).

16

The government has failed to show that the documents it cites have anything to do with Ali Ahmed. Indeed, even beyond the government's failure to make the requisite individualized showing, the documents it cites do not even provide support for the government's generalized claim that attorney-client materials are being abused by other, unnamed detainees. The initial documents cited by the government were found either in the possession of one of the deceased or were written by one of the deceased. And the additional documents are telling in what they reveal – not a single inappropriate document was found in an attorney-client envelope.

First, the document labeled "FOUO" is a red herring. "FOUO" or "For Official Use Only" stamps are *not* classification designations; documents so-labeled are not necessarily sensitive in any manner. "FOUO" is nothing but an internal Department of Defense designation whose purpose is to determine whether a particular document may be released to the public under the Freedom of Information Act. "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the public under [FOIA] . . . ."[42] The designation is specifically "not authorized as an anemic form of classification to protect national security interests"[43] and in fact "is, by definition, unclassified."[44] The Protective Order does not prevent prisoners from being in possession of FOUO documents; such documents by definition represent no security risks, and there is therefore no reason why a prisoner should not legitimately be in possession of such documents.

Second, the document that is marked with a crossed-out "SECRET" stamp is surely *not* a classified document and therefore should be of no concern to NCIS investigators. (The

---

[42]    Dep't of Defense Regulation 5200.1: C5.2.7.1.1.3 (emphasis added).

[43]    *Id.* 5400.7-R: C4.1.1.

[44]    *Id.* AP3.2.2.3.2.

government, of course, has failed to provide counsel with copies of the documents it relies upon for the instant motion, so counsel can only make an educated guess about the nature of the formerly "SECRET" document.)  Based on counsel's experience with handling the documents in these cases, it seems quite likely that the document was *once* classified and that – whether by request of counsel or the media, or *sua sponte* by the government – the document was declassified and marked accordingly.  It is typical for such documents to have the original "SECRET" stamp crossed out and "Unclassified" written beside it.  The Protective Order does not prevent prisoners at Guantánamo from possessing unclassified documents, and there is therefore no reason why a prisoner should not legitimately be in possession of such documents. The government's intimation that the document may *really* be a classified document that habeas counsel smuggled out of the secure facility, doctored, and sent on to one of their clients borders on slander.

Third, the so-called "knot-tying" document found by the government is not purported to have been labeled "attorney-client material" and is not alleged to have been discovered in a prisoner's privileged legal folder.  (Again, counsel have not seen the document and have no way even to know whether the government's characterization of this document is fair.)  The document therefore appears to have no relevance to the instant motion, which after all seeks review only of privileged items that have been confiscated by government agents.

Fourth, an apparent suicide note that was handwritten on the back of a piece of paper marked "attorney-client privileged" was quite obviously not being "hidden" by any of the prisoners.  The piece of paper was discovered in the mesh of the cell of one of the deceased, not secreted in the privilege folder of any of the prisoners.  If the deceased were seeking to keep this document from the prying eyes of the prison guards by disguising it as a privileged document,

18

why did he place in the open where it would inevitably be discovered?  The answer, most probably, is that the prisoner in fact wanted the note to be discovered and that he drafted it on the only piece of paper readily available to him.  In all likelihood, the only "abuse" of the privilege system was one prisoner's agreement to provide the deceased with a piece of paper from his privilege folder in order to allow him to express his last wishes to his family.

Finally, the government does alert counsel and the Court to a single document that – from the government's description of it, anyway – likely should not have been in the possession of a prisoner.  Remarkably, however, the document is an *email from JTF-Guantánamo itself* – a document that obviously was not provided to a prisoner by counsel, since counsel does not have access to such documents.  How did this document come into possession of a prisoner?  Counsel respectfully suggests that the NCIS inquire of JTF-Guantánamo and its staff, rather than take advantage of JTF-Guantánamo's apparent security breakdown as an excuse to rifle through the privileged papers of every prisoner in the prison.

The government's generalized security concerns are of the type already rejected by this Court.  The government, when it sought to justify the real-time monitoring and recording of attorney-client meetings, claimed that the prisoners would use meetings with counsel "to further terrorist operations or otherwise disclose information that will cause immediate and substantial harm to national security."[45]  This Court rejected the government's claims, finding them "thinly supported." As for the government's speculation that Petitioners' counsel are improperly sharing classified information with their clients, this Court long ago reminded the government that "the

---

[45]    *Al Odah*, 346 F.2d at 4 n.4.

19

government's decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance."[46]

Little has changed – except for the government's new-found concern with suicide prevention. The government introduced interrogation techniques designed to wear down the prisoners' mental health. It resisted any inquiry into prisoners' health – even as it recorded hundreds upon hundreds of suicide attempts. After driving prisoners to suicide, the government's concern for the mental health of its captives is impossible to take seriously.

### D. Any Further Review of the Prisoners' Legal Papers Should Be by This Court or a Special Master

If further review of the prisoners' legal papers is allowed, the use of a Department of Defense Filter Team is inappropriate here. As the government hints in its filing, *see* Resps.' Mot. 21 n.12, courts are reluctant to entrust attorney-client privileged materials to such governmental teams. Indeed, "the use of government taint teams has often been questioned or outright rejected by the courts."[47] Just last week, the Sixth Circuit overruled a district court's decision to permit review of potentially privileged documents by an independent government "taint team" because the review posed unacceptable risks to the attorney-client privilege.[48] Even

---

[46]      *Id*. at 14.

[47]      *In re Search of the Scranton Hous. Auth.*, No. 04-MISC Nos. 318-322, 2006 WL 1722565, at *5 (M.D. Pa. June 22, 2006); *see*, *e.g.*, *Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant).

[48]      *See In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275, slip op. at 6 (6th Cir. July 13, 2006), *available at* http://www.ca6.uscourts.gov/opinions.pdf/ 06a0245p-06.pdf.

when such teams have been authorized, "at least three courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better."[49]

Especially given the government's history of interfering with the attorney-client relationships in this case, as well as its expressed desire to "exploit the 'intelligence value'" of monitored attorney-client communications,[50] "it is important that the procedure adopted on this case not only be fair but also appear to be fair."[51] Yet "[i]t is a great leap of faith to expect that members of the general public would believe that any such Chinese wall would be impenetrable; this notwithstanding the honor of [those involved]."[52] Here, "there is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness."[53]

Concerns about the appearance of propriety are especially important here, given the difficulties that counsel has experienced in gaining the prisoners' trust. Before meeting with counsel in the aftermath of *Rasul*, the prisoners had "been detained virtually incommunicado for nearly three years without being charged with any crime."[54] Moreover, "Petitioners face an obvious language barrier, have no access to a law library, and almost certainly lack a working

---

[49]     *United States v. Stewart*, No. 02 CR 396, 2002 WL 1300059, at *6 (S.D.N.Y. June 11, 2002).

[50]     *Al Odah*, 346 F. Supp. 2d at 10 n.11.

[51]     *Stewart*, 2002 WL 1300059, at *8.

[52]     *In re Search Warrant for Law Offices*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994).

[53]     *United States v. Neill*, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997).

[54]     *Al Odah*, 346 F. Supp. 2d at 12.

knowledge of the American legal system."[55] Worse, as a result of statements from interrogators and other government personnel, many Petitioners suspect that their civilian attorneys are simply guards or interrogators in disguise.[56]  These suspicions will only intensify when Petitioners learn that their attorney-client materials are being reviewed by lawyers for the military that detains and interrogates them.

Another unacceptable aspect of the government's proposal is its suggestion that the Filter Team should be allowed to conduct its own review of the confiscated documents to determine whether they were properly "privileged" in nature, whether or not the documents are relevant to the NCIS suicide-plot investigation.[57]  If the filter team determines that the documents are not privileged, the government proposes, then they will be "returned . . . to JTF-Guantánamo for appropriate action."[58]  Such a review for privilege leaves "the government's fox . . . in charge of the [clients'] henhouse," with no check against the possibility that the Filter Team would draw "false negative conclusions" overriding legitimate claims of privilege.[59]

The government's motion is a patent attempt to chill attorney-client communications.  In it, the government suggests that "possibly others" – i.e., non-prisoners – may have participated in a "manifest abuse of the legal mail system."[60]  This unfounded assertion is a veiled threat to

_____

[55]     *Id.*

[56]     *See, e.g.,* Charlie Savage, *Guantánamo Detainees Find Fault with Lawyers,* Boston Globe, Aug. 10, 2005, at A1.

[57]     *See* Resps.' Mot. at 11.

[58]     *Id.*

[59]     *In re Grand Jury Subpoenas,* slip op. at 10.

[60]     Resps.' Mot. at 10.

habeas counsel, designed to deter them from communicating effectively with their clients.

Indeed, buried in a footnote is the government's conclusion that because counsel is prohibited

"from sharing . . . certain types of materials with detainees . . . [if] prohibited materials are

discovered in the course of review, the Filter Team would not be constrained from bringing the

matter to the Court's attention for appropriate action."[61]  Habeas counsel with access to classified

information are aware that they work under the shadow of possible contempt and criminal

actions, those with access to the legal papers have security clearances, and they are all officers of

the Court.  There is no warrant for a new team of Department of Defense lawyers to begin

scouring the prisoners' legal papers to uncover evidence of suicide "plots."

---

[61]    Resps.' Mot. 11 n.10.

## III.    CONCLUSION

For the preceding reasons, the Respondents' motion should be denied and Petitioners'

motion should be granted.


Dated: July 21, 2006

                                Respectfully submitted,

                                HELLER EHRMAN, LLP


                                /s/ Kit A. Pierson
                                Kit A. Pierson
                                DC Bar No. 398123
                                Brent N. Rushforth
                                DC Bar No. 331074
                                Heller Ehrman LLP
                                1717 Rhode Island Ave., NW
                                Suite 200
                                Washington, D.C.  20036
                                (202) 912-2100 (tel)
                                (202) 912-2020 (fax)

                                *Of Counsel*
                                Barbara Olshanksy (BO3635)
                                Gitanjali S. Gutierrez (GG1234)
                                666 Broadway, 7th Floor
                                New York, NY 10012
                                Tel: (212) 614-6464
                                Fax: (212) 614-6499