FILED WITH THE
COURT SECURITY OFFICER
CSO:
DATE:

█

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALLA ALI BIN ALI AHMED, <u>et al.</u>, | : |
| | : |
| | : |
| Petitioners, | : |
| | : |
| v. | :     Civil Action No.  05-1678 (GK) |
| | : |
| BARACK H. OBAMA, <u>et al.</u>, | : |
| | : |
| Respondents. | : |
| | : |

<u>MEMORANDUM OPINION</u>

Petitioner Alla Ali Bin Ali Ahmed ("Ali Ahmed" or "the Petitioner") has been detained since 2002, when he was a teenager, at the United States Naval Base at Guantanamo Bay Cuba. Respondents ("the Government") argue that his detention is justified under the Authorization for the Use of Military Force, Pub. L. No. 107-40 § 2(a), 115 Stat. 224, 224 (2001) ("AUMF"), which grants the Executive the power to detain individuals engaged in certain terrorist activities. The Petitioner disagrees, denies that he has ever engaged in such activities, and has filed a petition for a writ of habeas corpus [Dkt. No. 1].

The matter is before the Court on Cross-Motions for Judgment on the Record [Dkt. Nos. 183 and 189]. Upon consideration of the Motions, the Oppositions, extensive oral argument, and the entire

█

███████

record herein, Ali Ahmed's habeas corpus petition and Motion are hereby **granted**.

I.    **BACKGROUND**

    A.    **Procedural History**

    Petitioner filed his habeas corpus petition on August 22, 2005 [Dkt. No. 1].    After filing, there was extensive preliminary litigation regarding the Court's jurisdiction to entertain detainees' petitions, the applicability of various statutes, and the appropriate procedures to be used.

    After more than six years of litigation, the most important legal issue was resolved by the Supreme Court in <u>Boumediene v. Bush</u>, 553 U.S. __, 128 S.Ct. 2229 (2008).    The Court ruled that detainees at Guantanamo Bay, none of whom are citizens of the United States, are entitled to bring habeas petitions under Article I of the Constitution, and that the federal district courts have jurisdiction to hear such petitions.

    The Court did not define what conduct the Government would have to prove, by a preponderance of the evidence, in order to justifiably detain individuals -- that question was left to the District Courts.    <u>Id.</u> at 2240 ("We do not address whether the President has the authority to detain these petitioners nor do we hold that the writ must issue.    These and other questions regarding

███████

the legality of the detention are to be resolved in the first instance by the District Court."). Nor did the Supreme Court lay down specific procedures for the district courts to follow in these cases.

Boumediene was, however, definitive on at least two points: first, that the detainees are entitled to a prompt hearing, 128 S.Ct. at 2275 ("The detainees in this case are entitled to a prompt habeas corpus hearing."), and second, that the District Courts are to shape the contours of those hearings, id. at 2276 (finding that balancing protection of the writ and the Government's interest in military operations, "and the other remaining questions[,] are within the expertise and competence of the District Court to address in the first instance.").

In an effort to provide the prompt hearings mandated by the Supreme Court, many of the judges in this District agreed to consolidate their cases before former Chief Judge Thomas Hogan, for purposes of streamlining procedures for, and management of, the several hundred petitions filed by detainees. See Order (July 1, 2008) [Civ. No. 08-442, Dkt. No. 1]. On November 6, 2008, after extensive briefing from Petitioners' counsel and the Government, Judge Hogan issued a Case Management Order ("CMO") to govern the proceedings. This Court adopted, in large part, the provisions of that Order, while modifying it somewhat, as noted in Appendix A to

Dkt. No. 152.

Much pre-hearing activity has taken place under this Court's Case Management Order. The Government has filed the exculpatory evidence, automatic discovery, and additional discovery required under the CMO. The Government filed its Amended Factual Return on October 10, 2008, and amended it again on December 11, 2008. The Petitioner responded with his Traverse on March 12, 2009. After a period of extensive discovery, both parties filed substantial briefs accompanied by extensive exhibits.

On January 21, 2009 [Dkt. No. 129], the Court set April 14, 2009, as the date for the "merits hearing" on the Cross-Motions for Judgment on the Record. The hearing was continued to April 16, 2009. Less than a week before the original date for the hearing, and just before the Easter weekend, the Government informed Petitioner's counsel early in the day of April 9, 2009, and informed the Court later that afternoon at the Pre-Trial Conference, that it would be turning over to the Petitioner approximately 2000 pages of "newly available" material potentially related to the hearing. Over the holiday weekend, the Government refused to tell Petitioner's counsel whether the last-minute submission was either "inculpatory or exculpatory." Tr. at 15, 19, 21 (Apr. 16, 2009).

The Government did not make clear at what point in time these

███████

materials came into its possession.   What is clear is that they were packaged into a Factual Return and produced them in another petitioner's case on April 3, 2009.   Id. at 18.   The Government provided these materials to a second detainee's counsel on April 7, 2009.   Id. at 19, 27.   Yet nothing was made available to Petitioner's counsel until April 10, 2009.   On April 13, 2009, the Government submitted a subset of these documents to the Petitioner and the Court, referring to it as a Supplement to the record [Dkt. No. 205].

On April 14, 2009, Petitioner moved to strike this Supplement [Dkt. No. 207].   The Government claimed that it had pointed out to Petitioner's counsel information that related to Petitioner in the form of a roughly 200-page Supplement that pared down the larger filing (the "needle [in the haystack]," according to the Government), and that logistical challenges related to compiling factual returns made late production unavoidable in this case.   Tr. at 18-22 (Apr. 16, 2009).

The Court granted the Motion to Strike on the grounds that there was no way that Petitioner could have carefully examined even the pared-down Supplement at the last minute while preparing for this Merits Hearing, nor could counsel have done any independent investigation of what was in the materials even if he had been able to read them all.   The Supplement was not admitted as part of the

███████

record.

## II.   STANDARD OF REVIEW

The Government bears the burden of establishing that detention

is justified.  See Boumediene, 128 S.Ct. at 2270; Hamdi, 542 U.S.

507, 533-34 (2004).   It must do so by a preponderance of the

evidence.   Order, Appendix A at § II.A (Feb. 12, 2009) [Dkt. No.

152-2]; see also Basardh v. Obama, No. 05-889, slip op. at 10 n.12

(D.D.C. Apr. 17, 2009).

Initially, the Government took the position that Article II of

the Constitution and the AUMF granted the President the authority

to detain individuals.   See Gherebi v. Obama, 2009 WL 1068955, at

*8, *8 n.4 (D.D.C. Apr. 22, 2009).   The Government asserted, "[a]t

a minimum, . . . the ability to detain as enemy combatants those

individuals who were part of, or supporting, forces engaged in

hostilities against the United States or its coalition partners and

allies."   Resp't's Statement of Legal Justification For Detention

at 2 [Dkt. No. 103].

Since the change in administration, the Government has

abandoned Article II as a source of detention authority, and relies

solely on the AUMF.   Id. at *8 n.4.   Further, it no longer uses the

term "enemy combatant."   Its refined position is:

> "[t]he President has the authority to detain persons that
> the President determines planned, authorized, committed,
> or aided the terrorist attacks that occurred on September

11, 2001, and persons who harbored those responsible for those attacks. The President also has the authority to detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces."

Resp't's Revised Mem. Regarding the Gov's Detention Authority Relative to Detainees Held at Guantanamo Bay at 3 [Dkt. No. 174].

III. **ANALYSIS**

A.   **Evidentiary Presumptions**

As a preliminary matter, some attention must be given to the nature of the evidence that has been presented in this case, and how the Court, as fact-finder, will go about evaluating that evidence.     In attempting to meet its burden, the Government has provided evidence in the form of classified intelligence and interview reports that allegedly justify the Petitioner's detention. The reports contain the statements of Petitioner, as well as statements made by other detainees, that the Government argues demonstrate the Petitioner's status as a substantial supporter of the Taliban and/or al-Qaida.

The Government requested that a rebuttable presumption of authenticity be granted to all the exhibits it intends to introduce. Given its representations that the specific documents included in its case against Petitioner, as well as the documents

▆▆▆▆▆▆

provided to Petitioner's counsel in discovery, have all been maintained in the ordinary course of business, the Court will presume, pursuant to Fed. R. Evid. 803(6), that its documents are authentic.[1] As provided for in the Case Management Order, the Government's exhibits will be granted a rebuttable presumption of authenticity and will be deemed authentic in the absence of any rebuttal evidence to the contrary.

The Government has also requested that a rebuttable presumption of accuracy be granted to all the exhibits it intends to introduce. This request is denied for several reasons.

First, there is absolutely no reason for this Court to <u>presume</u> that the facts contained in the Government's exhibits are accurate. Given the extensive briefing and oral argument presented by counsel during the discovery phase of this case, as well the exhibits submitted at the merits trial, it is clear that the accuracy of much of the factual material contained in those exhibits is hotly

---

[1]    "[T]he requirement of authentication requires that the proponent, who is offering a writing into evidence as an exhibit, produce evidence sufficient to support a finding that the writing is what the proponent claims it to be." 2 K. Broun, <u>McCormick on Evidence</u> § 221 (6th ed.). <u>See also</u> 5 Christopher B. Mueller and Laird C. Kirkpatrick, <u>Federal Evidence</u> § 9.2 (3d ed.) ("[A] court called upon to resolve a dispute should not (at least in the absence of special circumstances) assume that a matter offered in evidence is what it appears on its face to be, or what the offering party claims it to be, but rather should require that party to establish by formal proof of some sort the identity or nature of the matter in question."

▆▆▆▆▆▆

███████

contested for a host of different reasons ranging from the fact that it contains second- and third-hand hearsay to allegations that it was obtained by torture to the fact that no statement purports to be a verbatim account of what was said.

Second, given the fact that this is a bench trial, the Court must, in any event, make the final judgment as to the reliability of these documents, the weight to be given to them, and their accuracy. Those final judgments will be based on a long, non-exclusive list of factors that any fact-finder must consider, such as: consistency or inconsistency with other evidence, conditions under which the exhibit and statements contained in it were obtained, accuracy of translation and transcription, personal knowledge of declarant about the matters testified to, levels of hearsay, recantations, etc.[2]

Denial of the Government's request for a rebuttable presumption of accuracy does not mean, however, that the Government must present direct testimony from every source, or that it must offer a preliminary document-by-document foundation for admissibility of each exhibit. As the Supreme Court noted in

---

[2]   While the Supreme Court did suggest in Hamdi that a rebuttable presumption "in favor of the Government's evidence" might be permissible, 542 U.S. at 534, it did not mandate it. In Boumediene, the Court clearly left it to the District Courts to craft appropriate procedures. Boumediene, 128 S.Ct. at 2272.

███████

▬▬▬▬

<u>Hamdi</u>, 542 U.S. at 533-34, hearsay may be appropriately admitted in these cases because of the exigencies of the circumstances.

Finally, while parties always retain the right to challenge the admissibility of evidence, the Court will be guided by the Federal Rules of Evidence, in particular Rule 402, providing that "[a]ll relevant evidence is admissible."  Once all evidence is admitted into the record, the Court will then, in its role as fact-finder, evaluate it for credibility, reliability, and accuracy in the manner described above.

### B.   Mosaic Theory

The Government advances six categories of allegations which, in its view, demonstrate that the Petitioner was detained lawfully. Above all, its theory is that each of these allegations -- and even the individual pieces of evidence supporting these allegations -- should not be examined in isolation.  Rather, "[t]he probity of any single piece of evidence should be evaluated based on the evidence as a whole," to determine whether, when considered "as a whole," the evidence supporting these allegations comes together to create a "mosaic" that shows the Petitioner to be justifiably detained. Gov's Mot. For J. Upon the Administrative R. and Mem. in Supp. at 2 (internal citation omitted) ("Gov's Mot."); <u>see also</u> Tr. at 46 (Apr. 16, 2009) (describing mosaic theory).  The Government argues, in this case and others, that "the evidence meshes together to

▬▬▬▬

███████

demonstrate" that the Petitioner engaged in conduct that allows the Executive to detain him.  Gov's Mot. at 24.

The Court understands from the Government's declarations, and from case law,[3] that use of the mosaic approach is a common and well-established mode of analysis in the intelligence community. This may well be true.  Nonetheless, at this point in this long, drawn-out litigation the Court's obligation is to make findings of fact and conclusions of law which satisfy appropriate and relevant legal standards as to whether the Government has proven by a preponderance of the evidence that the Petitioner is justifiably detained.  The kind and amount of evidence which satisfies the intelligence community in reaching final conclusions about the value of information it obtains may be very different, and certainly cannot govern the Court's ruling.

Even using the Government's theoretical model of a mosaic, it must be acknowledged that the mosaic theory is only as persuasive as the tiles which compose it and the glue which binds them together -- just as a brick wall is only as strong as the individual bricks which support it and the cement that keeps the

---

[3]   See, e.g., McGehee v. Casey, 718 F.2d 1137, 1149 (D.C. Cir. 1983) (recognizing that the "mosaic-like nature of intelligence gathering" requires taking a "broad view" in order to contextualize information) (internal citations and quotations omitted).

███████

██████

bricks in place.  Therefore, if the individual pieces of a mosaic are inherently flawed or do not fit together, then the mosaic will split apart, just as the brick wall will collapse.

A final point must be kept in mind.  One consequence of using intelligence reports and summaries in lieu of direct evidence is that certain questions simply cannot be answered, i.e., there are no witnesses to cross-examine or deposition transcripts to consult.[4]  Sizeable gaps may appear in the record and may well remain unfilled; each party will attempt to account for these deficiencies by positing what they think are the most compelling logical inferences to be drawn from the existing evidence. Accordingly, that existing evidence must be weighed and evaluated as to its strength, its reliability, and the degree to which it is corroborated.  In any event, the Government bears the ultimate burden of showing by a preponderance of the evidence that Petitioner's detention is lawful.  Just as a criminal defendant need not prove his innocence, a detainee need not prove that he was acting innocently.  In sum, the fact that the Petitioner may not be able to offer neat answers to every factual question posed by the Government does not relieve the Government of its obligation to satisfy its burden of proof.

---

[4]     No witnesses testified at the Merits Hearing.

██████

███████

### C.   The Government's Witnesses

The Government's chief pieces of evidence are the statements made by four witnesses, who are or have been detained at Guantanamo Bay.  The Government is not relying on any incriminating statements made by the Petitioner.  For the Government to prevail, it must do so based largely on the strength of evidence provided by the third-party witnesses.  The Court will first examine the reliability of each of those four witnesses, and then turn to the Government's specific allegations.

### 1.   ISN ███ - ████████████

The Government relies on the testimony of ████████████ ████████████, an individual whose credibility has been cast into serious doubt -- and rejected -- by another Judge in this District.  Gharani v. Bush, Civ. No. 05-429, classified slip op. at 4-6 (D.D.C. Jan. 30, 2009) ████████████████

████████████████████████████████████████████

(emphasis in original).  The Court agrees with Judge Leon's assessment.  Although the Government tries to establish the credibility of ████████ statements and distinguish this case from Gharani, ████████ statements cannot be credited.

████████████████████████████ Ali Ahmed ██

██████████████   Pet. Ex. 56 ████████████████████████ at 1-2.
Second, his inculpatory testimony is merely that he "overheard" conversations at Guantanamo Bay about Ali Ahmed's travels in Afghanistan. Gov. Ex. 26 ████████FM 40 (Jan. 5, 2005)) at 11. He does not identify who made these statements and under what circumstances, or any details of the conversation. In addition to coming from an unreliable witness, the inculpatory statement offered by the Government is based upon multiple levels of hearsay. Id.

Finally, ███████████████████████████████████, has made accusations against a number of detainees at Guantanamo Bay. Many of those accusations have been called into question by the Government. See, e.g., Factual Return at ¶32 n.4 ██████████████████████████ that describes ██████████ credibility with interrogators as "in question"); but see id. ████████████████████████████████████. In sum, he has shown himself to be an unreliable source whose statements have little evidentiary value, and that assessment is confirmed by the double-hearsay and lack of detail in his statement, as discussed supra.

2. ISN ████-██████████████████████████

The Government also offers statements made by ████████████ ██████████████████████████. This detainee twice said that he



the Petitioner ▮▮▮▮▮▮

Gov. Ex. 25 ▮▮▮▮▮▮ at ¶2.P

▮▮▮▮▮▮ ; Gov. Ex. 4 ▮▮▮▮▮▮

▮▮ at 4 ▮▮▮▮▮▮ . The first

▮▮▮▮▮▮ was a cursory and equivocal

statement that he ▮▮▮▮▮ the Petitioner ▮▮▮▮▮ and

the he ▮▮▮▮▮▮ Gov. Ex. 25 at ¶2.P. The second

▮▮▮▮▮▮ bears some degree of

reliability because it ▮▮▮▮▮▮ Gov. Ex. 4 at

4. In a third interrogation, the witness denied knowing "anyone."

Pet. Ex. 83 ▮▮▮ CITF Report (Sept. 23, 2003)) at 1. It is very

difficult to assess the recantation of his two ▮▮▮▮▮

▮▮▮▮▮▮ . At best, it appears that the detainee was being

totally uncooperative. See id. at 1.

However, and most importantly ▮▮▮▮▮▮ statements, in and

of themselves, are equivocal and lacking in detail or description.



[sic]

Gov. Ex. 4 at 4 (emphasis added). Further,



[5] Gov. Ex. 25 at ¶¶2.L-O.

This type of evidence, riddled as it is with equivocation and speculation, is similar to what the Court of Appeals found to be problematic in <u>Parhat v. Gates</u>, 532 F.3d 834, 846-47 (D.C. Cir. 2008).

For these reasons, this detainee's statements are not entitled to significant weight.

3.   ISN ███ - █████████████████████████████



the Petitioner three times, ████████████████ Ali Ahmed

██████ the witness ████████████████████████

██████ and responded that the man was ██████ a Yemeni "whom he

---

[5] ████████████████████████████████████████

██████████

saw when he was being smuggled from Zurmat to Banu." Gov. Ex. 23

████████ FM 40 (Nov. 8, 2002)) at 3.   Zurmat is in Afghanistan and

Banu is in Pakistan.

At the second ████████████████████████████████

███████████████        ████████████████████████████

████████████████████████████████████.   Gov. Ex. 24

██████████████████ at 3.   There is no explanation of

where ████████████ was coming from or how the witness knew

him.   The unnamed author of the intelligence report described

████████ as having trained at Al Farouq, and then fleeing to

Pakistan when the United States attacked.   Id. at 1.   The author

also characterizes the witness' reliability as ████████████████

Id.   The third ████████████████████████████████████████

██████████████████████████████████████████████████

██████████ "Bilal...Al-Yemeni," ██████████████████████████

████████████████████████ Gov. Ex. 3 ████████████ at 1-2.

Petitioner counters that ████████ statements are unreliable.

He points first to the fact that the witness has been diagnosed by

military medical staff as having a "psychosis."   Pet. Ex. 101

(Detainee Medical Profile Flowsheet).[6]   Given the fact that there

_____

[6]   It is very troubling that Petitioner learned of the
witness' medical condition only through the diligent work of his

██████████

-17-

███████

are no details in these documents, such as duration, seriousness,
or treatment of this condition, the Court does not give them a
great deal of weight, although a witness' mental health always has
some relevance to his reliability.

When, in October of 2003, the witness ███████████████ of
detainees captured at ████████, he did not identify the
Petitioner; rather, he claims that he did not know any of the men
██████████████ until he arrived at Guantanamo Bay.[7] Pet. Ex.
87 ██████ CITF Report (Oct. 4, 2003)) at 1.  ███████

████████████████████████████████████████

Along with this background of mental health problems (limited
as that information is) and inconsistent identifications, there is
evidence that ████████ underwent torture, which may well have
affected the accuracy of the information he supplied to

---

counsel, and not as a result of the Government's obligation to
provide him exculpatory information about the statements upon which
the Government relies in justifying detention. See CMO at § I.D.1.
Petitioner's counsel obtained this information when █████████
counsel turned over the document to him. It appears that
████████ counsel was able to retrieve the medical records only by
resorting to a FOIA request. Tr. at 106 (Apr. 16, 2009).

[7]    The Court inquired as to whether there is any evidence
that the Petitioner was included among the detainees ████████
████████ Tr. at 114 (Apr. 16, 2009). The Government had no evidence
establishing that he was or was not part of the ████████

interrogators.  ████████  spent time at Bagram and the Dark Prison, and alleges that he has been tortured.  Pet. Ex. 86 (Declaration of ███████████████████) at ¶¶8; 12-14.

The witness has also recanted his story that another detainee took the trip with him from Zurmat to Banu.  Pet. Ex. 88 ████████ CITF Report (July 25, 2003)) at 2.  He claims that he made inculpatory statements against that detainee ████████ because he feared further torture.  Pet. Ex. 88 at ¶14.  The Government claims that the "residual fear" of torture had been overcome by June of 2004, when he identified Petitioner ████████████, Gov. Ex. 3; Tr. at 152 (Apr. 16, 2009), since he had already, back in████████ ████████ been unafraid to tell his interrogators that he had given them bad information in the past, Pet. Ex. 87.

Based on two of these interrogations ████████████████████ ████████ -- one where he was honest with authorities about being uncooperative and one where he again identified the Petitioner -- the Government asks the Court to assume that his alleged mistreatment at several detention centers was effectively erased from his memory.  The Government has presented no evidence to dispute the allegations of torture at Bagram or the Dark Prison. See, e.g., Tim Golden, In U.S. Report, Brutal Details of 2 Afghan Inmates' Deaths, N.Y. Times, May 20, 2005, http://www.nytimes.com/2005/05/20/international/asia/

█████

20abuse.html#.  Nor has the Government presented any evidence that
███████ claimed to be unaffected by past mistreatment.  Therefore,
the Court cannot infer that past instances of torture did not
impact the accuracy of later statements.

   4.   ISN ███ - ██████████████████████

   The Government alleges that a statement made by ████████
████████████████████████████ demonstrates that Ali Ahmed
received military training.   ████████ identified ████████ from a
photograph shown to him at Bagram.  The intelligence report says
that Al-Qahtani stated, "191 -████ received military training in
Afghanistan near Kabul."  Gov. Ex. 1 (████████ SIR (June 17, 2002))
at 9.  The reliability of this identification is discussed in depth
infra, at Part III.D.2.

   D.   Government Allegations

   The Government rests its case on the totality of evidence
encompassing six major disputed factual issues: the Petitioner
fought in Afghanistan, trained in Afghanistan, used the kunya
████████ traveled in Afghanistan with al-Qaida and/or Taliban
members, stayed at ████████ with al-Qaida and/or Taliban members,
████████████████████████████████████████████████████████████████

   For his part, Petitioner claims to have gone to Pakistan
before the attacks on September 11 (and the Government no longer

█████

██████████

challenges that particular fact) in order to find a religious school at which to study the Koran. He denies ever going to Afghanistan, training at an Al-Qaida camp, fighting against anyone, or being a member of a terrorist group. Traverse at 1-2, 25-27; Gov. Ex. 8 (ISN 692 FM-40 (July 30, 2003)) at 2 (reporting that Petitioner denied ever traveling to Afghanistan); Tr. at 38 (Apr. 17, 2009). Ali Ahmed admits that he was staying at ███████ a guesthouse for Yemenis in Faisalabad, Pakistan, where he was arrested ███████████ in March of 2002. Gov. Ex. 43 (ISN 692 FM 49 (Aug. 5, 2003)) at 1. He denies any connection to ██

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████[8] Traverse at 29-33;

see also Pet. Ex. 11 ██████████████████ at 3 ("NOTE: in the files of those captured with the source, he is mentioned but not well-known by any of the others with him at the ████████").

The Government's argument challenges a number of facts in Petitioner's story, attempts to demonstrate that his explanation

████████████████████████████████████████████

---

[8]     For these allegations, the Court accepts as true the arguments that the Government makes about the ████████████ ████████████████████████ Such a finding is not a substantive ruling on the alleged activities of these detainees, all or some of whom have habeas petitions pending in this District Court.

██████████

████████

████████████████████████████████, and that Petitioner's lies
about certain facts cast doubt on his entire explanation of his
activities and whereabouts.

### 1.   Participation in Battle

The most serious charge leveled by the Government is that
Petitioner joined al-Qaida and/or the Taliban in battle against the
United States and/or coalition forces.  If proven, this fact alone
would almost certainly justify Ali Ahmed's detention.   The
Government does not base the charge on a hearsay confession made by
Petitioner; in fact, he denies involvement in any terrorist
activity whatsoever.  Traverse at 25-27.  Nor does the Government
base this charge on direct allegations made by third parties.  The
Government admits it has presented no evidence stating that Ali
Ahmed has participated in battle.  Pet. Ex. 6 (Requests for
Admission) at ¶41; Resp't's Factual Response Statement at ¶¶28-29,
31 [Dkt. No. 198]; Tr. at 22 (Apr. 17, 2009).

Rather, the Government asks that Ali Ahmed's participation in
battle be inferred from a web of statements made by witnesses who
were commenting on Petitioner's non-military activity.   The
Government urges the Court to adopt its theory that because
witnesses it offers as credible claim that Petitioner had military
training, went to Afghanistan, and then traveled with and stayed in
the company of al-Qaida fighters, and because Ali Ahmed's denial of

such behavior is not credible, it is more likely than not that Petitioner fought with al-Qaida. Tr. at 15-16 (Apr. 17, 2009).

The Government's position on this charge rests on its mosaic theory. The theory cannot support the charge.

First, it is extremely significant that there is absolutely no "direct" evidence, at whatever hearsay level, of Ali Ahmed's participation in battle. The Government has not pointed to any statement in the record that directly accuses the Petitioner of fighting. Tr. at 22 (Apr. 17, 2009). This weighs heavily with the Court.

Second, assuming for the moment that the patchwork of evidence woven together by the Government is suggestive of the fact that Ali Ahmed's version of the events is not accurate and that he did travel with al-Qaida and/or Taliban fighters, it still falls far short of establishing the more serious charge that he took up arms in support of al-Qaida and/or the Taliban. Given the gaps in the evidence, the Government must do more than rely on evidence of associations to support the inference that Ali Ahmed actually fought in battle.

Even if the evidence is to be believed that Petitioner's story is false and that he was in Afghanistan, there simply is no affirmative proof that he took up arms. The Court will not make the leap that the Government does, that simply because he was in

███████

Afghanistan, he was there to fight.

Similarly, assuming that the Government's evidence of Ali Ahmed's time in Afghanistan is reliable, it does not represent strong enough evidence from which to infer that he participated in the fighting. Although ██████████████████████ Petitioner ████████████ would contradict Petitioner's explanation of his whereabouts at the relevant time, it is not per se evidence of wrongdoing. Likewise, ██████████████████████████████ ████████████████████████████ is several steps removed from proof that he actually fought ████████.

Even if one assumes, _arguendo_, that Ali Ahmed was indeed in Afghanistan,[9] Petitioner argues that one reason he may have traveled with certain people is because of the chaos in the area as thousands attempted to flee a war-torn country. There is ample evidence in the record that Afghanistan was in chaos during this period, and that legions of people were trying to cross the border into Pakistan in order to flee the violence. Pet. Ex. 82 ████████ ████████████████████ at 2 (describing thousands of refugees in Khowst, Afghanistan); Pet. Ex. 105 ████████████████████ at ¶¶A.4-5. Given this reality, it may indeed be the case that a

---

[9]   The Government often accuses the Petitioner of ████████ and thereby conceding the accuracy of certain facts, when all counsel is doing is arguing in the alternative. This legitimate, oft-used strategy does not concede or waive any issues.

███

young Arab man sought the company of those individuals with whom he shared a common language, religion, and culture, and that he may have gone on to stay with these same men upon arriving back at ███ ███. The bottom line is that even if Ali Ahmed lied about being in Afghanistan, that fact is not a sufficient basis for leaping to the conclusion that he fought with al-Qaida and/or the Taliban.

### 2.  Training

There is one direct piece of evidence in the record, allegedly "corroborated" by other witness' statements, that indicates that Ali Ahmed received military training in Afghanistan. ███████ is the source of the statement, which is reported as, "191 - ███ received military training in Afghanistan near Kabul." Gov. Ex. 1 at 9. The Government argues that this evidence, in combination with other witnesses' statements that place the Petitioner in Afghanistan and in the company of al-Qaida fighters, demonstrates that Ali Ahmed did indeed receive military training.

There are significant questions about the reliability and accuracy of ████████ statement. The nine-word hearsay allegation made by ███████ does not describe the training with any specificity. For example, there are no details about which camp the training took place at, how long that training lasted, or what the training consisted of. The interview with ███████ was conducted in English and Arabic without an interpreter. Id. at 1.

███

███████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

A related infirmity of the statement is that it does not purport to be based on ████████ direct observations. It is simply a declarative statement that ██████ trained at some point, without any information as to how ████████ knew that. Even more troubling is the fact that, in later interrogations, when ████ ██████ was asked to list the names of those he trained with, he did <u>not</u> include the Petitioner. Pet. Ex. 69 ██████ MFR (Apr. 25, 2003)) at 1-2. Despite these glaring weaknesses ████████ brief nine-word statement, the Government asks the Court to infer that ████████ nd the Petitioner trained at the same camp. Tr. at 66-67 (Apr. 16, 2009).

Additionally, the Government argues that ████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████ Whether true

---

[10] In reviewing the record, the Court has found a comment in Pet. Ex. 103 ████████████████ that █████████████████ ████████ <u>Id.</u> at 1. Interestingly, the Government never brought this comment to the Court's attention.

███████

-26-

██████

or not, it is pure speculation.[11]

The larger issue is that ██████████ initial identification suffers from serious reliability problems. First and foremost, the detainee made the inculpatory statement at Bagram Prison in Afghanistan, about which there have been widespread, credible reports of torture and detainee abuse. See, e.g., Golden, Bagram, supra, at 19; Pet. Ex. 86 at ¶12. ████████████████



this reason, ████████████████████████████████

████████████████████████████████████████████

_____

[11] ██████████ was later interrogated on many other occasions. He never again mentioned Ali Ahmed, just as no other detainee or other individual whose statements appear in the record accused the Petitioner of training.

[12] The same report asserts that ██████████ has never [actually] been tortured since being taken into custody in Pakistan." Pet. Ex. 68 at 1.

██████

███

technique," carries less weight in this case.  Gov. Ex. 14 (Decl.

of ███████████ at 2-3.

In addition, it does not follow, as the Government argues,

that ████████ recanting with respect to another detainee was

the extent of all his false allegations; simply because he admitted

that he falsely implicated some people here does not mean that he

was truthful at all other times.  Second, ████████ s sole

identification of the Petitioner named him as "191 - ██████" Gov.

Ex. 1 at 9.  Petitioner denies that this is his actual name, or

that  he  ever  used  the  kunya, █████" He  argues  that

identifications based on this name are problematic because ███ is

a fairly common nickname in Arab countries, somewhat equivalent to

to the use of "Joe" or "Buddy" in this country.  Tr. at 83-84 (Apr.

16, 2009); see also Pet. Ex. 55 (Classified Tr. of Feb. 26, 2009

Status Conference) at 23 (Government represented that ████ is a

very common name. If you run the name █████ through [a search of

the Government's records] you will get thousands, potentially tens

of thousands of documents or hits.").

The Government admits that there is confusion over who "191 -

███ refers to in this context.  Tr. at 14-15 (Apr. 17, 2009).

The number 191 refers to the detainee number assigned at Bagram.

The Government "preliminarily" admitted that two detainees were

given this same number -- both Ali Ahmed and ████████████

███

████████

███████████████████████.  _Id._ at 14; see Pet. Ex. 120 (ISN ████

Memorandum for Commander (Nov. 5, 2007)) at 10 n.51.[13]  To further

confuse matters, ████████ actually admits to having had military

training.  Pet. Ex. 120 at 10 n.51.  On this record, therefore, it

is completely unclear to whom the words "191 -████ refer --

Petitioner, ███████, or someone else.  The detainee number, of

course, is central to the allegation of training as well as the

rest of the Government's case.

Third, the Government argues that the fact that █████████████

made the allegation that █████ received training in the same

interrogation session where he made inculpatory statements about

himself is indicative of his honesty and reliability.  The Court

finds this fact to be of limited significance.  Any effort to peer

into the mind of a detainee at Bagram, who admitted to fearing

torture at a facility known to engage in such abusive treatment,

simply does not serve to rehabilitate a witness whose initial

credibility must be regarded as doubtful.

Finally, ████████████ reliability has been cast into doubt by

█████████████████████████████████████  At times, ████████████████

---

[13]   This admission was made on the second day of trial.  On
the first day, the Government insisted that evidence showing that
████████ was assigned number 191 at Bagram was the product of a
"typographical error" in the intelligence report.  Tr. at 144 (Apr.
16, 2009).

████████

██████

██████████████████████████████████  Pet. Ex. 114 (ISN

██████ Memorandum for Commander (June 20, 2008)) at 4.  By the time of

his ██████████████ at Guantanamo Bay, long after he made the

only allegation that he would make against the Petitioner,

intelligence reports indicated that his ████████████████████

██████████  Pet. Ex. 69 ██████████████████████ at 1.

These serious concerns about ██████████ credibility are not

compensated for by other pieces of the mosaic. ████████████████

████████████████████████████████████████████████████████████

██████████████  That is simply incorrect.  No statement of any

other witness corroborates that Petitioner received military

training in Afghanistan.  At most, the statements of other

witnesses suggest that Petitioner was in Afghanistan at some point.

They do not address the training allegation.

The Government argues that the surrounding details provided by

████████████████████████████  make the training allegation

more likely.  However, it matters little that all these other

witnesses place the Petitioner in a geographical area where

military training was a logistical possibility.  Without more, the

Court simply cannot credit the allegation of training as a

justifiable basis for further detention.  See <u>Gharani</u>, at 7-8.

### 3. Traveling

A third major allegation, and important tile in the mosaic, is



████

that Ali Ahmed traveled around Afghanistan ████████████
████████████████████, and did so in the company of a band of
██████████ fleeing the battlefield. This charge is related
to the fact that the Petitioner was ███████████████████████
████████ and placed in Afghanistan during a portion of time when
he claims he was in Faisalabad. ██████ the Government alleges,
fled Afhganistan with ██████████████████, crossed into
Pakistan, and then made his way to ██████████, where he was
arrested ████████████████████ in March of 2002.

The Petitioner denies these charges, continues to assert that
he remained at ██████████, and never entered Afghanistan except
when he was detained at Bagram. Gov. Ex. 42 (ISN 692 FM 40 (Dec.
12, 2003)) at 1; Traverse at 26-29; 12. He attacks the
Government's evidence that he was identified as ████ on the ground
that the statements were made by unreliable witnesses, some of whom
had undergone torture in the past or feared the use of torture in
the future. Traverse at 34-51. Demonstrating that, he argues,
reveals that the allegations of his travel to Afghanistan are not
true.

Turning first to the point about ██████ the Government sought
to buttress its mosaic theory by presenting evidence that ██████
████████████████ Petitioner ████ ██████" This name, it
alleges, is his "kunya," a nickname of sorts. The practice of

██████

taking on a kunya is common in Arab countries. Gov. Ex. 7 (Decl. of ████████████████████, "Names, Aliases, Kunyas and Varients") at 1-2. It is also a common practice among terrorists, as it serves as a method for concealing their true identities from enemy forces. Id. at 6.

Although the Government agreed that the mere use of a kunya is not, in and of itself, sufficient evidence to justify detention, Tr. at 128 (Apr. 16, 2009), it argues that use of the kunya████ is central to this case because it casts significant doubt on Ali Ahmed's account of his activities, and also demonstrates that each of the Government's witnesses provides credible evidence. The latter point is based on the fact that ████████████████ ████████████████████████████████████ Petitioner ████ ███████████████████████. See supra, at Part III.C. Petitioner denied to an interrogator ever using the kunya. Gov. Ex. 8 at 2. The Government submits that the numerous independent identifications of the Petitioner as ██████ cannot simply be a coincidence, and that it must be true that Ali Ahmed in fact does go by the name ███████ Gov's Mot. at 24, 28.

The evidence the Government relies on to support its mosaic theory is problematic in several key ways. First, ████████ identification has been cast in significant question, due to the fact that it was elicited at Bagram amidst actual torture or fear

██████

██████

of it.  There are also serious questions about the particular individual who he identified at Bagram.  ██████ appears to be a fairly common kunya, Pet. Ex. 55 at 23, and the obvious confusion over the record-keeping at Bagram does not make ███████ identification of this Petitioner as ██████ as opposed to ██████ ████████████████, a reliable one.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████  See supra, at Part. III.C.  There is no way to know whether the Government's informants were staring at ███████████ the same person, or if they were looking at completely different people.  Without more, their identifications cannot carry the weight that the Government places on them.

There are also problems with the relationship of the kunya evidence to the overall theory.  Again, assuming that the Government's information is true, the immediate implications of it are not as damaging as the Government argues.  If Ali Ahmed is ██████ it does suggest that he lied about at least some of his story.  Also, it suggests that he entered Afghanistan at some point, and was later identified to have received military training.  As demonstrated above, however, these allegations do not bear independent scrutiny because of the gaps in the record, and thus

██████

███████

cannot be upheld in their own right.   Accordingly, the predicate

for establishing Ali Ahmed's identity as ███████ cannot sustain the

Government's theory.

        4.    ████████

     Evidence was offered to establish that Ali Ahmed's undisputed

stay at a guesthouse in Faisalabad, called ████████ , supports, at

least in part, the conclusion that he is a substantial supporter of

al-Qaida and/or the Taliban, as well as a trainee and fighter for

one or both of those groups.   The validity of this argument rests

in large part on a guilt-by-association theory: i.e., the

Government argues that because others at the guesthouse were

involved with terrorist groups, and the Petitioner stayed there for

a substantial period of time in their company, without having to

pay for food or rent, he too must have been a terrorist.   Combining

these facts with the allegations that he trained and traveled with

terrorist forces in Afghanistan, the Government believes the

conclusion is inescapable that Petitioner is a member and/or

substantial supporter of al-Qaida and/or the Taliban.

     The Government is not contending that staying at a guesthouse

is per se evidence of terrorist activity in this case.   Rather,

such evidence provides "one more piece of the mosaic," which, when

viewed as a whole, depicts Ali Ahmed as a member of enemy forces

whose cover story simply has too many holes in it to be credited.

The Government points out that ████ the fighters who ████ said the Petitioner traveled with -- ████████ ████████ -- also stayed at ████. Gov. Ex. 5 ████████ Gov. Ex. 34 ████████ (June 19, 2002)); Gov. Ex. 23 at 3-4. These ██ men admitted to fighting on behalf of enemy forces, along with another guest staying at the house, ████ ██ Gov. Ex. 5 at 1 (reporting ████ admission of fighting); Gov. Ex. 34 at 2 (reporting ████ admission); Gov. Ex. 30 ████ ████ (June 24, 2003)) at 1 (reporting ████ admission). ████████████ Viewing this information with all the other evidence it has presented, the Government argues that the logical inference is that Ali Ahmed was also involved with these terrorist groups. Tr. at 80-82 (Apr. 17, 2009).

The evidence, as discussed above, is problematic. ████ who attested to horrendous incidents of torture, at one time gave inculpatory statements about Petitioner, at another time recanted those statements, and yet at a third time re-affirmed them. Further, ████ identification of Petitioner is plagued by

██████

the doubts discussed <u>supra</u>, at Part III.D.2.  Finally ████████

equivocal statement that ██████████████ Petitioner ████████

████████████████████████ simply is not the material of which a

reliable hearsay identification is made.  Once those pieces of the

mosaic have been removed because of their unreliability, the

Government is left with what is essentially a charge of guilt by

association.

The problem with this charge is that there is no solid

evidence that Ali Ahmed engaged in, or planned, any future

wrongdoing while ██████████████████████████████.  There

is no evidence that he was arrested with any weapons or other

terrorist paraphernalia; nothing of this kind was found in his

locker.  Pet. Ex. 6 at ¶¶18-20.  Though others at the House, ████

██████████████████, admitted their affiliation with al-Qaida, they

did not implicate Ali Ahmed in any terrorist activity.  Pet. Ex. 36

████████████████████ at 3; Pet. Ex. 45 ████████████████████

████████████ (reporting that admitted fighter thought Ali Ahmed was

████████████████████████████████████ There is ample

evidence in the record to indicate that guesthouses are common

features of the region, serving as way stations for impoverished

young men spending time away from home.[14]   <u>See, e.g.</u>, Pet. Ex. 7

_____

[14]   On the other hand, there is also evidence that
guesthouses served essentially as barracks for terrorist fighters

██████

(Decl. of ████████████ (Nov. 30, 2008)) at ¶5.

As noted, no weapons were found or seized during the arrest of
Petitioner.  Pet. Ex. 6 at ¶¶18-20.  It is likely, based on
evidence in the record, that at least a majority of the ████████
████████ guests were indeed students,[15] living at a guesthouse that
was located close to a university.  Pet.'s Mem. Of Points and
Authorities in Support of Mot. For J. at 30-31 n.21-22; but see Tr.
at 74 (Apr. 16., 2009) (demonstrating that Government contests
remaining individuals were students).  Further, even though the
police arrested all of the ████████ men staying at the House,
they appear to have ignored ████ the man who operated the House.
If the ████████ was such a hotbed of terrorist activity, it is
incomprehensible that its operator was not, at a minimum, detained
for questioning.  The evidence does not demonstrate, even as to
associational guilt, that Ali Ahmed's stay at ████████ provides
justification for his detention.

---

who had retreated from the front.  Gov Mot. for J. on Record., Ex.
1 (Decl. of ████████, "Background Declaration - Guesthouses")
at 1.

[15]    Neither party can identify the exact number of guests at
████████ but parties agreed ████████ is a reasonable number.  Tr.
at 85 (Apr. 17, 2009).  ████████ individuals arrested there were
detained at Guantanamo Bay and subsequently released; the
Government represented that this was likely part of the
Administrative Review Board process, and not because the Government
determined that the two were not lawfully subject to detention.
Tr. at 108 (Apr. 17, 2008).

██████

Nor is the Government's case strengthened by the charge that ███████████████████████████████████████████████████, a man whom the Government has, at times, alleged is a "sworn member of al-Qaida," training-camp operator, travel facilitator, and major figure in the planning of 1999 attack against the United States. Factual Return at ¶28 n.2.; <u>but see</u> Tr. at 78-79 (Apr. 17, 2009) (explaining that ███████████ disputes charge that he is sworn member of al-Qaida).

The Government presents strands of evidence to tie ████ ███████████. It points out that one detainee claims that he was the director of a guesthouse in Peshawar, as well as a "Yemeni" guesthouse in Faisalabad. Gov. Ex. 27 (ISN 707 FD 302 (Sept. ████ 2002)) at 1. The reliability of this statement is established via a weak inference that the witness knew ███████████████████ based on the witness' visit to a different guesthouse of ████ ███████████ Tr. at 77-78 (Apr. 17, 2009). It also points to the ████████████████████████████████████████████████████████ stayed at ███████████ at some point, Gov. Ex. 44 ████████ FM-40 (Sept. 26, 2003)) at 1, ██████████████████████████████████ ████████████████████████████████████████████████████████

The Government seeks to weave these disparate strands of evidence so as to suggest that ████████████████████████████ ███████████, and thereby strengthen its claims of Petitioner's



associational guilt.  The fabric -- or mosaic -- simply will not hold; the connections are too weak and attenuated.

As a final attempt at providing more tiles for its ███ corner of the mosaic, the Government submitted for the first time on the initial day of the Hearing ███████████████████

████████████████████ The Petitioner made an oral motion to strike the evidence.  The Court denied the motion, but made it clear to parties that this decision would be subject to

------------------------

█████

reconsideration after it had had an opportunity to hear all the evidence.

The Court has elected to reconsider, and concludes that the evidence shall not be admitted.  Having heard all of the testimony now, and in particular the testimony about the document and the context of its retrieval, the Court strikes the document on the grounds that its prejudicial value far outweighs any probative value.[17]  See Fed. R. Evid. 403.  (It should be noted that there is absolutely no evidence that the Petitioner either wrote or understood Russian, the language in which the document was written. Cf. Gov. Ex. 43 at 1 (recounting Petitioner's statement that he had to communicate with Russian guest ███████ using "hand signals").)

5.  █████████████

An additional tile in the Government's mosaic is the evidence



---

[17]    The Government had already presented evidence purporting to show that ████████ was a haven for terrorist activity, ████ ████████ that ████ men with admitted connections to al-Qaida stayed there.



not advanced for its value as the sole justification for detention; rather, according to the Government, it lends credence to other evidence that casts Ali Ahmed as more than an innocent student captured in the wrong place at the wrong time.



Even viewed merely as one part of a mosaic,







Reading just the four corners of the document, there is no indication that ████████ ████████████████████████████ cannot be credited as a piece of evidence that contributes in any way to a finding that it is more likely than not that Ali Ahmed was legally detained under the AUMF.

## IV.   CONCLUSION

For all the foregoing reasons, and for the reasons stated during the Hearing held on April 16-17, 2009, the Court **grants** the petition for a writ of habeas corpus.  The Government has failed to prove, for all the reasons stated above, by a preponderance of the evidence, that Alla Ali Bin Ali Ahmed was "part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners."

As to the claim of participating in fighting, the Government produced virtually no credible evidence; as to the claim of receiving military training, the conclusory nine-word hearsay statement by ████████ does not show that it is more likely than

████

not that he received such training; as to the claim that he
traveled around Afghanistan in 2001 and 2002 in the company of
terrorist fighters fleeing the battlefield, even if the Government
had proven this charge, which it did not, such a fact would not
constitute substantial support; as to the evidence that he stayed
at ████████ , the Government has certainly proven that he stayed
there, but has utterly failed to present evidence that he was a
substantial supporter of al-Qaida and/or the Taliban while he did
stay there; as to the Government's position about the significance
of locating Petitioner's alleged kunya on a list, the Court finds
this argument without any merit whatsoever.

When taken all together as facts which comprise a mosaic
theory, the evidence does not satisfy the Government's burden of
proof: i.e., the Government's picture does not establish that it is
more likely than not that Petitioner fought for the Taliban, that
he received military training, that he traveled in Afghanistan with
terrorists fleeing from the scene of war, that his stay at ████
████ demonstrated he was a supporter of al-Qaida, ████████
████████████████████████████████████████
████████████████████████████████████████

Mindful of the limitations on the scope of the remedy in this
situation, see Kiyemba v. Obama, 555 F.3d at 1024 (D.C. Cir. 2009),
the Court further orders the Government to take all necessary and



appropriate diplomatic steps to facilitate Petitioner's release forthwith, and to report back to the Court no later than June __, as to the status of Petitioner's release.

May __, 2009

_/s/_____
Gladys Kessler
United States District Judge

Copies to: Attorneys of Record via ECF